### MINNIE LEE STREIGHT V. THE STATE.

#### No. 1135. Decided April 19, 1911.

#### Rehearing denied May 24, 1911.

**1.—Murder—Change of Venue—Fair and Impartial Trial.**

Where upon trial of murder, the evidence on the application for change of venue, showed that the testimony in the case and the opinion of the trial judge denying bail were published in newspapers having a general circulation throughout the county of the prosecution, that a number of citizens had hanged and burned in effigy the judge granting defendant bail, and that defendant could not get a fair and impartial trial on account of the existing prejudice and excitement, the venue should have been changed.

**2.—Same—Dismissal—Codefendant—Severance.**

Upon trial of murder, where defendant filed a motion to place his codefendant on trial first, but the State's counsel dismissed the prosecution against said codefendant, the latter then became a qualified witness for either party, although the prosecution had not agreed that it would not prosecute codefendant in the future, and there was no error.

**3.—Same—Indictment—Jury and Jury Law.**

Where a grand juror had intense opinions in the matter of the prosecution against the defendant, but was not a private prosecutor in a legal sense, this was no cause for challenge or a ground for quashing the indictment.

**4.—Same—Continuance—Sickness.**

Where a defendant was so ill as not to be able to confer with her counsel, and too sick to stand a trial without lying down on a cot, etc., she should not have been forced to trial.

**5.—Same—Jury and Jury Law—Selecting Jury.**

While it would not be such error as to require reversal, in the absence of injury shown, yet where a motion to exclude veniremen from the courtroom during the selection of a jury would show that the defense would be prejudiced by not excluding said veniremen, the same should be granted.

**6.—Evidence—Life Insurance—Motive.**

Where, upon trial of murder, it was shown that the policies on the life of the deceased were in part payable to defendant, there was no error in admitting testimony that defendant inquired about such insurance.

**7.—Same—Evidence—Opinion of Witness.**

Upon trial of murder it was error to ask defendant's witness, on cross-examination, if she did not tell another that the defendant had made three or four different tales about the killing, and that there was no use to ask defendant

about it. This was simply the opinion of the witness. Following Drake v. State, 29 Texas Crim. App., 265.

### 8.—Same—Evidence—Conduct of State's Counsel.

Upon trial of murder, it was improper for the district attorney, in the presence and hearing of the jury, to say that the defendant's witness had testified on a former trial that deceased was lying in a perfect position of rest, the court having sustained an objection to this question.

### 9.—Same—Evidence—Rebuttal.

On trial of murder, there was no error where defendant's witness had denied that defendant told him that deceased was after defendant, running her around the room with a razor, and that she got a pistol and shot him, to show in rebuttal that she did make such statement.

### 10.—Same—Evidence—Impeachment.

Where the testimony of the defendant as a witness was attacked by a severe cross-examination, it was permisible to prove that she had told her cousin, with whom she was raised and who was a lawyer, of her husband's conduct, but acting on the advice of her cousin remained with her husband.

### 11.—Same—Evidence—Experiment.

Where, upon trial of murder, the State contended that when the pistol was fired it had burned the eyebrows of deceased, the defendant should have been permitted to show by an experiment which defendant's witness had made that a pistol shot would not have burned the eyebrows of deceased when fired, regardless of the range.

### 12.—Same—Evidence—Contradicting Witness.

Where, upon trial of murder, the witness for the defendant had testified that she heard the bedsprings screak at the time of the homicide, there was no error in permitting the State to show that the said bedsprings did not screak.

### 13.—Same—Character of Deceased—Threats—General Reputation.

Where, upon trial of murder, the defense introduced testimony that the deceased had made threats to kill the defendant, there was no error to admit testimony of the general reputation of deceased as a peaceable, law-abiding citizen; although testimony that the witnesses had never heard deceased curse his wife or any other member of his family was hardly proper.

### 14.—Same—Evidence—Bias and Prejudice of Witnesses.

Upon trial of murder, the defendant should have been permitted to show that the State's witnesses were biased and prejudiced and had ill will towards defendant, by showing that when the judge had admitted her to bail that they hanged said judge in effigy.

### 15.—Same—Child Witness—Discretion of Court.

Where no injury was shown to the defendant, there was no error in admitting the testimony of a witness who was only nine years old.

### 16.—Same—Evidence—Telephone.

Upon trial of murder, where the witnesses recognized the voice of defendant and another, there was no error to permit them to testify as to a conversation between them over the telephone.

### 17.—Same—Evidence—Opinion of Witness.

Upon trial of murder it was error to permit the State's witness to testify as to the opinion of a third party about the killing, and her statements with reference thereto in the absence of the defendant.

### 18.—Same—Evidence—Contradicting Witness.

Upon trial of murder, where defendant's witness was asked if she did not tell another that deceased was one of the highest minded men she ever knew,

it was error not to permit her to tell what she did say, and to force her to answer the question yes or no.

**19.—Same—Evidence—Letters—Motive—Degrees of Homicide.**

Where, upon trial of murder, the defendant had testified on cross-examination as to certain troubles between herself and her husband, the deceased, which were caused by the belief of deceased in her infidelity, and that certain letters written by defendant but whose authorship she denied tended to shed light upon these troubles and the homicide, as to motive and as to the causes leading up to it, and determined to some degree the character of the homicide in the event she committed it. Held, that these letters, in the light of all the evidence and especially defendant's testimony, were admissible in evidence, although the examination in chief limited these troubles to a certain period of time, and some of the letters extended beyond that time. Davidson, Presiding Judge, dissenting.

**20.—Same—Bail—Habeas Corpus—Constitutional Law—Statutes Construed— Practice.**

Where, upon appeal from conviction of murder, it appeared from the record that defendant had immediately after the indictment was found, and before her main case was set for trial made application for a writ of habeas corpus which was granted, and that the court afterward set the main trial on the same day for which the writ of habeas corpus was made returnable and which application was not heard, but defendant was forced to trial and carried back and forth from jail during her trial, such practice was in direct conflict with article 1, section 12, Constitution of Texas, and was a denial of defendant's right under articles 635 and 636, Code Criminal Procedure, to remain on bail during trial if her case was bailable.

**21.—Same—Habeas Corpus—Practice on Appeal.**

Where it appeared on appeal from a conviction of murder that the trial court had granted a writ of habeas corpus but had refused to hear the same and forced the defendant to trial, and the case was remanded on appeal, the lower court is instructed to hear the writ of habeas corpus before proceeding with the main trial of the case.

**22.—Same—Evidence—Impeachment.**

Where, upon trial of murder, the State for the purpose of impeachment introduced certain excerpts from the testimony of the defense witnesses at a habeas corpus trial and affidavits before the grand jury, it was error not to permit the defendant to introduce the other portions of such testimony and statements.

**23.—Same—Conduct of Counsel—Side Bar Remarks.**

Side bar remarks of counsel for both State and defendant are improper and under certain circumstances may lead to a reversal.

Appeal from the District Court of McLennan. Tried below before the Hon. Richard I. Munroe.

Appeal from a conviction of murder in the first degree; penalty, imprisonment for life in the penitentiary.

The opinion states the case.

*Williams & Williams* and *W. R. Parker,* for appellant.—On question of admitting letters in evidence: McMasters v. State, 33 So., 2; Woodward v. State, 42 Texas Crim. Rep., 188; 21 Cyc., p. 893 and 916; Gaines v. State, 53 S. W. Rep., 623; Price v. State, 65 S. W. Rep., 909; Wright v. State, 36 Texas Crim. Rep., 427; Strange v. State, 38 Texas Crim. Rep., 280; Fischel v. State, 14 S. W. Rep., 391.

On question of corroborating defendant's testimony: Greene v. State, 17 Texas Crim. App., 395; Harrison v. State, 20 Texas Crim. App., 387.

Upon question of showing animus between defendant and deceased: Woodward v. State, 42 Texas Crim. Rep., 188; Tomlin v. State, 25 Texas Crim. App., 676; McNamara v. State, 43 Texas Crim. Rep., 521; Wakefield v. State, 50 Texas Crim. Rep., 125; Wilburn v. State, 77 S. W. Rep., 3; French v. State, 47 Texas Crim. Rep., 571; 6 Ency. Ev., pp. 592, 606.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, JUDGE.—The appellant was indicted charged with the offense of murder. Upon a trial she was convicted and sentenced to the penitentiary for life.

1.  At the threshold we are confronted with a grave question—an application for change of venue in this case. This is a matter generally left to the sound discretion of the trial court, but in this instance, after a careful reading of the record, we have come to the conclusion that the application should have been granted. Without going into details in this matter, it is sufficient to say that the newspaper reports in the record show that there was a deep interest taken in this case, and that when the habeas corpus hearing was held the District Court was crowded, and the attendance continued from day to day, the paper saying: "Jammed to the very doors, with every seat on the lower floors and in the balconies occupied, besides the many who stood up both downstairs and upstairs." That at the conclusion of this hearing the trial judge expressed his opinion that "defendant had shot the deceased while he was asleep in bed" and he refused bail. That the evidence in the case and the opinion of the trial judge were published in newspapers having a general circulation over the entire county. That upon a second habeas corpus hearing, again much interest was manifested, and when the judge hearing the cause granted the defendant bail, a number of the citizens of McGregor hanged and burned him in effigy, and this fact was published broadcast over the county. Without commenting on this further than to say that the record discloses that men who engaged in this proceeding, were men of standing in their town and county, it shows to what extent passion and prejudice were swaying the minds of those people. It further appears that when a reputable attorney was appointed administrator of the estate, because he was one of the attorneys of the defendant, a special train was chartered for the citizens to go en masse to the county judge to protest, and he stepped aside and let another be appointed to avoid this scene. The printing office was broken into and a paper issued against the will of the administrator in charge. Witnesses from many portions of the county testify that they do not believe the defendant could get a

fair and impartial trial. Many testify they believed she could. Some testify they had an opinion in the case themselves, but they thought she could get a fair and impartial trial. Every witness who testified, either for the State or defendant, said they had heard the case discussed more or less, and a great many stated that they had read the evidence and had read the opinion of the judge expressed at the habeas corpus trial. Not a single witness testified that he knew nothing of the case, and a great majority had formed an opinion. As said by this court in the case of Steagald v. State, 22 Texas Crim. App., 496:

"Among English speaking peoples 'the right of trial by jury' has always been considered, and Sir William Blackstone justly denominates it 'the palladium of civil rights.' Our Constitution requires that it 'shall remain inviolate.' As an essential factor in the protection of the life and liberty of the citizen, it is considered so important that our laws declare that 'the defendant to a criminal prosecution for any offense may waive any right secured to him by law except the right of trial by jury in a felony case.' But he is not only entitled to a trial by jury, but our Constitution characterizes the kind of jury which is to try him, and says: 'The accused shall have a speedy, public trial by an impartial jury.' Not only so, but it is also the will and policy of the law that the 'trial shall be alike fair and impartial to the accused and the State.' An impartial jury and a fair trial is what the State demands, and in her demands she is no respecter of persons. She has one law for all—the high and the low, the rich and the poor, the friendless—the most debased and hardened of criminals. The greater and more horrible the crime charged the greater and more imperative the necessity that these safeguards— these landmarks of the law—should be constantly looked to and kept steadily in view, lest, perchance, they should be forgotten, denied or ignored in those natural promptings of a manly—it may be—and certainly a human instinct, which, standing appalled and outraged at the very contemplation of such heinous iniquity, condemned the suspected criminal in advance, and mainly, perhaps, through the magnitude of his imputed crime. In such cases, when the popular mind is inflamed and popular indignation is ready and clamorous to become the executioner of its own vengeance, it is the part of an honest, fearless, manly judiciary to uphold the standard of the law, and to vindicate its majesty and integrity regardless of all consequences."

This appellant may be guilty of one of the most diabolical offenses known in the annals of crime. It may be the citizenship were justly wrought up to the high tension this record discloses, and she deserved the punishment accorded to her in this case, but our courts are organized that every person may have a fair and impartial trial by an impartial jury, uninfluenced by any other consideration than the evidence adduced on the trial. Many people have a wrong conception of an application for a change of venue, construing it as a

reflection upon the citizenship of a county. This is not a correct view, because juries are selected under the rules of law, and while possibly, and doubtless it is true, that among the citizens of McLennan County, twelve men, yea, possibly hundreds of men, could be found who would give to this defendant a fair and impartial trial—that is not the question. The question to be decided is, do we know as near as mortals may, when we take into consideration the mode and method provided by law for the selection of juries that a jury will be obtained, that will not be influenced by the passions of the hour, by public sentiment, who have not prejudged the case in their own minds, or any consideration other than the evidence in the case, and inasmuch as this case must be reversed, upon other grounds any way, we have decided that a change of venue should be granted, and the judge of the district is ordered to make an entry changing the venue in this case in accordance with the provisions of the statute. The mind of human kind is such that it more readily gives credence to testimony in consonance with preconceived notions or ideas, than to receive testimony of a different character. The State can not be hurt, for all it desires is a jury of twelve men who will receive their first impressions from the evidence adduced on the trial. See Coffman v. State, this day decided.

2. It appears in this case that Mrs. Pattie W. Neff was indicted as an accomplice in this homicide. Defendant filed a motion as provided for by article 707 of the Code of Criminal Procedure, that Mrs. Neff be first placed on trial. When this application was presented, the State's counsel suggested to the court grounds on which to quash the indictment against Mrs. Neff, and the court entered an order quashing the indictment. The defendant insisted that the motion to quash the indictment was insufficient, and demanded a verdict of not guilty on a trial. In all this she was joined by Mrs. Neff. The defendant insists that in this there was error, because the State did not agree that it would not prosecute Mrs. Neff for this offense, and the affidavit of Mrs. Neff is attached showing that she declined and refused to testify inasmuch as she had been indicted for complicity in this offense and her testimony might be used as evidence against her in case she was again indicted. Article 709 of the Code of Criminal Procedure provides that the attorney representing the State may at any time dismiss a prosecution as to one or more defendants, and the persons so discharged may be introduced as a witness by either party. Mrs. Neff, when the indictment was quashed, stood as though she had never been indicted, and was a qualified witness for the State or defendant. It is true, if the State desired to *compel* her to testify, over her objection, it would have been incumbent upon the State to agree not to prosecute her. But the State did not seek her testimony, and when the State placed her in position where she was qualified as a witness, it had done all that was required. If Mrs. Neff was conscious of her innocence, she need have no fear. Any witness for a

defendant whether he had ever been indicted or not, could make this demand, if Mrs. Neff could do so when she stood freed from an indictment. When the State placed Mrs. Neff in position so she could testify under the law, it had met the requirements of our Code.

2½. We do not think the court erred in refusing to quash the indictment against this defendant on the grounds set out in the motion. While the facts disclose that the juryman challenged had intense opinions in this matter, yet the evidence does not disclose that he was a prosecutor in the sense that word is used in the Code. In addition, the challenge was withdrawn at the time the grand jury was empaneled and not renewed until after the indictment had been returned into court.

3. Owing to the disposition of this case it becomes unnecessary to pass on the application for a continuance and the action of the court thereon. One thing we will say, however, that if a defendant is really sick he should not be forced into trial. In matters of law, judges and judicial officers can pass on 'legal questions, but if an affidavit is filed, and a showing made that a person is too unwell to confer with counsel and too sick to stand trial, without lying down on a cot all the time, medical advice should be obtained, and if such person is feigning, of course, it presents no ground; but if on the other hand competent medical men should, after examination, pronounce the person in such condition of health as to render him unfit to stand the strain of a trial, the case should be postponed or continued. In this case it is stated she did lie on a cot all through the trial. If she was playing sick, the injury she perhaps suffered was just. But if, on the other hand, she was really too ill to sit, the fact the court forced her into trial in this condition was an indication to the jury that in the mind of the judge she had committed such crime that she deserved no consideration.

4. While it would not be such error as to require the reversal of a case, in the absence of injury shown, for the court on motion to refuse to exclude the veniremen from the courtroom during the selection of a jury, yet where an application is made, claiming that the examination which should be made would prejudice her defense and rights, it should be granted, and in an extreme case we would feel called on to reverse a case if it was shown that application had been made, and by the refusal of the court to do so the defendant was prevented from asking proper questions for fear of prejudicing the jury, or in asking them might create a prejudice in the minds of the veniremen by reason of such examination, or that such a number would and did disqualify by reason of having a previously formed opinion as might prejudice defendant's rights.

5. The record in this case is very voluminous, the motion for a new trial containing one hundred and fourteen grounds, and takes up eighty-five typewritten pages of the transcript. To discuss each as-

signment in detail would be of but little benefit. However, we will take notice of all that we think may affect another trial in this case.

On the night of the 18th day of last June defendant shot and killed her husband. He was undressed and in bed at the time he was found, and physicians called testify that they examined the deceased, probed the wound, and located as they thought the course of the bullet. Defendant testified to unfriendly relations between her and her husband, and that he had frequently threatened her life, and she was afraid of him. No one was present other than defendant and her husband at the time of the shooting. She testified that he had been quarreling and accused her of infidelity; that she got up out of the bed and made down a pallet, when deceased, being very angry, said he would put an end to it, and reached under his pillow for a razor he had under the pillow. As he did so, she fired and ran out in the street. Those first meeting her said she was nervous and greatly excited. Two witnesses who were out in the street say they heard deceased making a noise like he was turning about, while one witness said she heard the bed springs "screak" as he turned over. The doctors testify that a man shot in that part of the head where deceased was shot, the bullet ranging as they judged this one did, "no voluntary movement would occur, as there would be no volition, and would produce instant paralysis of the entire physical system." The theory of the State was that deceased was asleep when he was shot, and never moved after the fatal injury was inflicted. We do not think the court erred in admitting the testimony of the physicians. They were practicing physicians, and under the laws we now have, before a man can get license to practice medicine, he must demonstrate that he has a knowledge of the matters testified to by the witness in this case.

6. Appellant also objected to the witness Hall being permitted to testify that on the day of the homicide defendant was inquiring about the life insurance policies of deceased. As qualified by the court, that it was shown that the policies on life of deceased were in part payable to defendant, this bill presents no error.

7. Appellant complains that while her witness, Mrs. Tom Evans, was on the stand, on cross-examination, she was asked if she did not tell Miss Belle Hale, who had come to inquire about the killing, "it was no use for her to ask Mrs. Streight about this because she had already told three or four different tales about it," and when the witness denied making such statement, Miss Belle Hale was permitted to testify that the witness did make such statement to her. This would be an opinion of the witness, and under the holding in the case of Drake v. State, 29 Texas Crim. App., 265, and authorities cited, this was error.

8. Appellant in a proper bill shows that while the defendant's witness, Tom Evans, was on the stand, on cross-examination, State's counsel asked him "if deceased was not lying in a perfect position of

rest." The court sustained the defendant's objection, when it is shown that State's counsel, in the presence and hearing of the jury "stated that said witness had so testified on a former hearing." This was improper. Objections to testimony would be of no avail if prosecuting officers are permitted to state that the witness had so testified, getting the testimony as effectively before the jury as if the witness had been permitted to testify.

9. Appellant also complains that while the witness Evans was on the stand he was asked if he did not tell Mr. Burge "that Mrs. Streight (defendant) had told him that deceased was after her, running her around the room with a razor, and that she got a pistol and shot him," and upon the witness denying it, in rebuttal the State placed Mr. Burge on the stand, who testified that Mr. Evans did tell, him that defendant had made that statement to him. Under the rule laid down in the Drake case, supra (page 272), this was admissible. This also applies to the testimony of S. C. Walker in bill No. 47, as to what Mrs. Evans claimed defendant told her.

10. We agree with appellant that the testimony was admissible to the rejection of which complaint was made in her thirty-fifth bill of exceptions. Where the testimony of a defendant as a witness is attacked, by severe and insinuative cross-examination, by proof of previous contradictory statements, by failure to make complaint when the State's cross-examination claims it was called for, such defendant may be aided by supporting testimony. Ross v. State, 60 Texas Crim. Rep., 547, 132 S. W. Rep., 793; Cabrera v. State, 56 Texas Crim. Rep., 141. When the State had her to testify that she had not told her neighbors of the deceased's improper conduct as testified to by her, it was permissible to prove that she had told a cousin with whom she was raised, a lawyer, and acted on his advice in remaining with her husband.

11. The State contended that when the pistol was fired it had burned the eyebrows of deceased. The appellant complains that "while defendant's witness, W. A. Holt, was on the stand and he had testified that he was in the ammunition business, handling firearms and sporting goods, and had been for sixteen years; that he was much accustomed to the use of firearms of all character; that he had had much experience with them and observation of them; that he had made some experiments as to the effect of pistol shots in regard to a powder burn, using a 38-calibre Colt's pistol, the kind found by deceased after he was shot, and the same character of shells as had been taken from the pistol of the defendant; that he made twenty-five shots at ranges from one inch to four feet; that he had targets prepared with human hair placed in the position and to represent human eyebrows; that he used a piece of wood covered with pieces of leather with eyebrows fastened on them for dummies and laid them on two pillows (it having been shown that the deceased was lying on two white feather pillows when he was first reached immediately

after he was shot) ; witness had the target and paraphernalia in court with him and exhibited the same in connection with his testimony, showing how the tests had been made. Defendant then proposed to prove by said witness that with the bullet hole being one inch above the nasal eminence, as was shown by testimony to have been the fact in this case, it would be impossible at any range for the powder to burn the eyebrow off, and the following occurred: "By Mr. Williams, for defendant: Mr. Holt, from the experiments you have made, and your knowledge of firearms, and the tests you have made to show what can and what can not be done with reference to an eyebrow being burned off with a pistol shot—— By Mr. Cross: We object. By Mr. Williams: With a 38-Colt's pistol at any range—— By the Court: The objection is sustained. By Mr. Williams: We except to the ruling of the court. By the Court: That is what I expected you to do. By Mr. Williams: We except to the remarks of the court. We except to the ruling of the court, because we think the witness is qualified as an expert. He made the tests under the same circumstances as the facts in this case, and we think he is in a position to testify upon the subject."

The court doubtless in rejecting the testimony thought it would be of but little weight, yet as it was shown in making the tests human hair was used, a pistol of the same size and cartridge of the same make and the testimony should have been admitted. The defendant states her contention was that these eyebrows had been burned after the shooting by some person unknown to her, and that a pistol would not burn the eyebrows when fired, regardless of the range, and it would have been proper to admit such testimony as she had on this point, without reference to its weight. Mr. Underhill, in his work on Evidence, lays down the rule: "Sec. 233. If the conditions and circumstances existing or alleged to exist in the case, and surrounding the subject matter, are reproduced for the experiment, a witness who is an expert may accompany his statement of opinion with a statement of the result of an experiment." Under the circumstances, the remark of the judge was hardly proper. Harrell v. State, 39 Texas Crim. Rep., 204; Kirk v. State, 35 Texas Crim. Rep., 224.

12. The court did not err in the matter complained of in bill No. 39. A witness for the defendant had testified she heard the bed springs screak. The State's witness testified that the springs came from his place; they were guaranteed springs, and that he was on the bed on which deceased died that night and the springs did not screak.

13. Appellant complains that testimony was admitted that the reputation of deceased was that of a peaceable, law-abiding citizen. As qualified by the court, we do not think there was any error in admitting this testimony. The court says: "That the defense had introduced a great number of witnesses to prove that the deceased made threats to murder his wife through a long number of years, not only to murder her, but to murder his children, and that he went

into a rage nearly every day, generally at the breakfast table, and cursed and abused his wife and threatened to kill her on divers and sundry occasions, and that she had testified that he had drawn a six-shooter on her on several occasions, and threatened to cut her throat on a number of occasions. That under the statute, which provides that when the defendant begins to prove threats, then the State can prove the general reputation of the deceased for being of a peaceable and inoffensive disposition, this testimony was admitted." But it was hardly permissible, as complained of in the next bill, for the witnesses to be permitted to testify that they had never heard deceased curse his wife or any other member of his family. These witnesses knew deceased as one business man knows another, and it could hardly be expected that they would know what took place in the privacy of their home, when they testify they had never been in his home.

14. For the purpose of showing the state of feeling, bias and prejudice of certain witnesses in this case, the defendant desired to prove that when the presiding judge of this court had admitted her to bail, that they were a portion of the crowd and took part in hanging Judge Davidson in effigy. Also that defendant selected Lud Williams, her attorney, as administrator of the estate of deceased, and the Probate Court appointed him, and they forcibly took charge of the printing office; it further appearing in the record that some number of citizens were coming from McGregor to Waco to protest to the county judge against the appointment. When men like those permitted their anger to get the better of their judgment, as shown in these bills, the defendant should have been permitted to show they were biased and had ill will towards her, and these facts would tend to show it.

15. In regard to admitting the testimony of J. D. Cotton, who was only nine years old, this is a matter lodged in the sound discretion of the trial court, and we would not feel inclined to disturb his ruling in a matter of this character, especially as the bill shows no injury to defendant.

16. We do not think the objections well taken to the testimony of Miss Sallie Ritchie and S. C. Walker as to what was said over the telephone. Miss Ritchie was the operator, made the connection, and said she recognized the voices of defendant and Mrs. Neff, and what was said would be admissible as a circumstance in the case, considering the State's theory.

17. It could not be admissible as to what Miss Belle Neff's individual opinion was in this case, and it was error to permit Mrs. Walker to testify that Miss Belle Neff "stated to her the night of the killing that she did not see how Mrs. Streight could have done that, that Mr. Streight had always been good to her." Miss Neff was not upon trial in this case, and what statement she might have made as to her opinion in the matter in the absence of defendant would not be admissible.

18.   It appears from bills of exception Nos. 50 and 59 that when Mrs. Rayborn, a witness for the defendant, was testifying, that the State was permitted to ask her if she did not tell A. S. Davis "that deceased was one of the highest-minded men she ever knew." The witness denied making this statement, but began to tell what she did say when she was compelled to answer yes or no. The State was then permitted to prove by Mr. Davis that she had so said to him. Defendant then placed Mrs. Rayborn on the stand, who would have testified, if permitted, that what she said was "anyone who read the editorials written by deceased would think he was one of the highest-minded men they ever knew," but the court declined to permit her to do so. We do not see upon what ground the witness, in the first place, was not permitted to tell what she did say, and if not, then it was certainly permissible, if it was sought to impeach her, to permit her to tell exactly what she had said in regard to the matter.

19.   One of the most serious questions in the case is presented in bills of exception Nos. 54, 55 and 56, all of which relate to three letters, the proof of which was sufficient to admit them in testimony if they were admissible for any purpose. The letter shown by bill of exceptions No. 54 was written in July, 1909, to a Mr. Johnson, about his brother, who was lying at the point of death. Deceased is not shown ever to have seen that letter. The one shown by bill No. 55 shows on its face to have been written deceased by defendant December 29, 1903, and expresses for him undying affection, and begging him to return to his family, and showing at that time a separation. The one shown by bill No. 56 was written to Robert Wood, and if written by defendant was damaging to her theory. She denied writing these two last mentioned letters. These last two letters were in deceased's possession at the time of his death, and had been for a number of years, defendant testifying that she saw them in deceased's possession shortly after they were dated in 1903. Defendant denies writing the letter to Robert Wood, and if she wrote it, it would show that at that period she was untrue to her husband and was guilty of adultery with Wood. At this time she and deceased were living apart, temporarily at least; and, if she wrote the letter to deceased, dated December 29, 1903, she expressed contrition for her misdeeds, and begged him to forgive her and speaks of deceased in the most endearing terms. Shortly thereafter they were reunited and lived as husband and wife until the homicide in 1910. If deceased had the Wood letter, defendant had convinced him she was not the author of it, or by living with her for six or seven years thereafter it is claimed he had condoned the offense.

As the letter addressed to Robert Wood is the one most damaging in its nature, we will pass on its admissibility first. It was remote in time, and to be admissible in evidence it must shed some light on the cause of the homicide from the standpoint of the State or defendant, or must tend to show the motive of the defendant in the com-

mission of the offense, or tend to establish the degree of homicide, if it was not justifiable as claimed by defendant.

The defendant testified in the case, and on direct examination, among other things, she says:

"On Sunday morning, before the homicide, we went to Sunday-School. I stayed for church, and my husband did not. When I went home from church I found him in an upset state of mind, but I had company, and he did not say anything as to what was worrying him. My company left in the afternoon, but still he did not say anything as to what was worrying him, until Monday morning. Early, about daylight, I expect, he turned over to me, and said: 'Do you know a Mr. Farwell?' and I was asleep, and it awakened me; and I said, 'What did you say?' He repeated the question. I said, 'Yes, I know a Mr. Ed Farwell. I met him on the train between Dallas and Waco. He is a traveling man. It was in October, during the fair.' He turned over and took hold of my throat with both of his hands, his body over mine. He said, 'You are a God-damned, lying slut, and I will kill you,' and he kept abusing me, and I said, "Don't you remember I told you about meeting Mr. Farwell, and he told me about his sister-in-law having run over a little child with an automobile, and what a demented condition she was in afterwards.' He said he did not, and kept up his abuses and cursing, until he turned over again, and said, 'I will kill you for this,' or something like that. I got up and went upstairs, and went to bed in my little girl's bed, and stayed until time to get breakfast. I came down, and he renewed the quarrel while I was dressing. My little boy was upstairs, and heard him, and said, 'Papa, I wish you would cut that out,' and I went on and got breakfast. After breakfast was over my little boy said, 'Mama, what was the matter with papa? What was that he said?' His father had gone at that time.

"From then on, that week, he kept this fussing up all the week, cursing and abusing me about that one little matter, and I said to him, 'Why do you say I am a liar?' He said, 'Because he did not give you his card. He wrote his name on your card.' He had found a card with this man's name in an old card case of mine somewhere, on Sunday before I came from church, and he kept that matter up all during the week, accusing me of having lied, and abusing me. I was in a very nervous condition.

"On Friday I had company again for dinner. It was Mr. Pat Neff's mother. He was very pleasant at dinner, but after dinner, when he started off, he did not say good-bye, and I followed him to the hall, and said, 'Aren't you going to kiss me good-bye?' He said, 'No, let your lover kiss you good-bye.' I said, 'I haven't any lover. What do you mean?' He said, 'That is all right,' and walked out. In the evening he came home early. I still had company, and he did not say anything, but that night he told me that he had found a letter that

he supposed was written to me.  He just said, 'When did you get this letter?' and produced that letter, and read it, and I recognized it immediately.  I said, 'This is a letter that Tom O'Brien wrote to Nettie Randall two years ago, when she was staying here.'  Well, he did not believe that, and cursed me about that, and said he was going to kill me about that and the other affair.  He kept that fussing up during the night until away late in the night.  I did not go to sleep.  I had not slept scarcely any all the week, and he did not go to sleep until late in the night.  He said he meant to kill me.  He said he knew who the letter was from.  He meant to kill me and he meant to kill the man; he did not believe the letter was from Tom O'Brien and never would, and kept on with his threats."  The witness told about hiding the pistol, and says the next morning he renewed the threats, and remarked, "I have a pistol besides that one which was under my pillow."  The night he was killed the witness says Mrs. Neff was at her home and deceased came in and began sharpening his razor, and after some conversation told Mrs. Neff he did not believe the story about Tom O'Brien writing the letter he found in the house.  Mrs. Neff replied she was going home, as she did not want to witness a family row, when deceased replied, "You will witness something worse than that if you stay here."  She testified deceased afterwards placed the razor under the pillow of his bed.  Again she says:

"We had been living in McGregor very nearly six years.  Commencing with my life there in McGregor, the first few months—in fact, the first year—I worked in the office with him, and he became so disagreeable I quit working in the office.  He was very disagreeable, and as the years went on he became more so.  I worked in the office the first year.  He got so disagreeable I could not work any longer, and because of my health.  Part of the time I did not have any health, and it was too hard on me.  His treatment of me and his family was cruel and violent.  There were many times, at meal times, especially, that he was very violent.  So much so that I was just crazed, and so were the children.  I can think of several instances.  There was one, I think it was in March of this year, he came home to supper one night.  I had been expecting a long distance call from my cousin, Mr. McLean.  He was in Cleburne, trying a case, and had told me he was coming back by to see me, and would call on me Saturday, perhaps.  I left the house in the afternoon, and told the central girl that if I got a long distance call while I was not at the house to send the message up to my husband.  He came home to supper, and asked me if I had gotten this long distance call.  I said, 'No, I went out shopping.  Went to town this afternoon.'  He became angry, and said I was a liar.  That I did not have to go to town; that I was always gone; never home attending to my business, and cursing and abusing me.  He called me a God-damned lying slut.  That was his special name for me.  That was what he called me more

than anything else. That was a favorite expression of his when addressing me and his little girl. I say that I have heard him call Fredda, his daughter, that. I can not remember all those names that he called me that evening. He was in the habit of calling me every vile name he could think of. I hate to tell them. I hate to repeat the language that he used. He called me a bitch often. With reference to the last four or five years of my life, we had fusses at the breakfast table often. It was almost a daily occurrence. Those fusses would go to the extent that he would threaten my life. He would call me these names that I speak of, or some of them. He would do that often. I won't say he did that every breakfast meal, but it was almost a daily occurrence. He did that in the presence of my children. As to the other affair that I was telling about, we were at the supper table when he asked me if I had gotten this long distance call, and he abused me, as I said before, and my little boy rebuked him, and he said, 'You get up and leave here. You are not wanted here.' So he, the boy, got up and went to the picture show. The little girl was spending the night away from home, at Mrs. Neff's. He kept up this abuse until I said, 'I am going to call an officer,' and I started to the telephone, and he went through the bath-room, and got his pistol by the time I had gotten to the telephone, almost. He said, 'If you attempt to call an officer I will kill you and the officer,' and he stepped to the front door, to close the front door, with his pistol in his hand. . . .

"I can tell of another incident when he had drawn a pistol on me there in McGregor. He had drawn it on me several times. I do not know that I can tell the exact circumstances, but it would just be in a violent fit of temper. I do not believe I can give a part of the details of any other circumstance right now, when he had drawn a pistol on me. He would get so mad on these occasions that he was beside himself. He was insane. He had the expression of a maniac on his face. I was afraid of him. I was very much afraid of him. I had fear with reference to my children. He had threatened to kill the entire family. I regarded there being serious danger of his doing that. There were many times when I thought he would. I regarded my life in danger. I had been regarding my life in danger for all these years, there at McGregor. I did not quit him because he had always threatened that he would kill me if I did. I believed it."

She then says: "I had arrived at a conclusion with reference to how my end was going to be. I always felt that it would be a tragedy. I expected he would kill me. That was the way I expected to die. I had lived in that expectation ever since I had been down there. I had had that opinion for the last four or five years, especially." She then testifies to many acts of cruelty, such as choking her, striking her, etc.

On cross-examination she testified that deceased abused her before he went to McGregor. He abused her while they lived at Morgan,

Albany, at Shawnee, and other points named, covering a period of twenty-one years, and while she was at Fort Worth she thought he was going to kill her there. She says, "He called me a damned slut. He called me a God-damn bitch. He has called me such names as chippie and whore." She says: "I came back to Fort Worth to my sister once, when I lived in Shawnee. I went as a trial to myself and to him, not as a separation. We were, however, separated at that time. I thought he would kill me at the time I separated from him. I went back to him because of some threats he made. He made some threats that if I did not go back and live with him again he would kill me. That was in Fort Worth. That was about seven or eight years ago." . . . "He threatened me, and told me that unless I did live with him he would kill me. That is one reason that I went back to him. There are other reasons. As to the other reasons, I left Oklahoma, came to Fort Worth to live with my sister. I told him that I was not going to stay away if I found that I wanted to go back, or if I found that he would be better. He came to see me several times. We were there about six months. One of the times he came he had threatened me in different ways, especially with my life, and my sister begged me not to go back. I said that I had better. She said, 'You have tried him before;' but he came one day, with a letter, written supposedly by me. This was in Fort Worth. He came with a letter written supposedly by me. The letter was written to a man in Oklahoma. The man's name was Wood. I did not write the letter. He wrote the letter. He said he did. My husband told me that he wrote the letter that he showed me. He said if I did not come back to live with him he would produce this letter and swear that I wrote it, and would take my children from me. That is what he told me. He was there at that time, in Fort Worth." . . .

"As to my coming back, there was no begging done. He made those threats. He had that letter and another letter purporting to have been written by me to him. (A letter was exhibited to the witness by the county attorney.) This is one of the letters that he wrote and held over me as a threat that if I stayed away from him he would use it to take my children. He threatened to use that letter on me if I stayed away, because it was begging him to take me back." . . .

"I never went to Mrs. Woods' house in McGregor about the first part of February of this year, and told her that I had written a letter to John Johnson, and that I wanted to get it in my possession, because there was going to be a tragedy in my life, and that it was the only thing out against me. I never made the remark to anyone. I did not ask Mrs. Woods if she had a letter written by me to John Johnson, who was then dead, among his effects. I never made the remark that I wanted that letter, because there was going to be a tragedy in my life, and that was the only thing out against me." . . . "I felt that he was going to kill me, and that it was just a question

of how long. I thought he would kill me some time. He cursed and abused me almost every day. He called me a damned slut, and damned whore, and damned bitches, and God-damned bitches, etc." . . . "I did not tell Henry Magill in Shawnee in 1903 that I was going to kill Mr. Streight. I did not tell him that if he ever accused me of being untrue to him again I was going to kill him, if I had to kill him while he was asleep." . . . "I was going to leave town, if I could have gotten money enough. I was going to leave, if I could have gotten the money, but he would not give it to me. I wanted to leave Saturday night" (the night of the homicide). . . . "He told me a great number of times through the years gone by that he was going to kill me; for twenty-one years he had been telling me that at intervals."

While we have copied rather copiously from her testimony, yet we present but a small part of it. We will merely say that if the jury believed her theory of the case and disbelieved the theory of the State, they could have found grounds to have decided she acted in self-defense, or if under one theory of it, guilty of any offense, not of murder in the first degree.

When she took the stand as a witness she was subject to a cross-examination like any other witness, and the State had the right to discredit her version in any proper manner. It is true, as the defendant says, in her direct examination they limited their examination to the six years of their life at McGregor, but under no rule we know of, if they went into the history of the family troubles for six years, that the State would be limited to this period in their cross-examination to this time, if there was a good reason for not so doing. By her testimony it is shown that the family troubles, if family troubles there were, were caused by the belief of deceased in her infidelity. If her testimony is true, he had cursed her because of this belief for a period of more than ten years. They were separated about the period this letter was written to Wood, and the cause of this separation was deceased's opinion that she was untrue to him. She, from her testimony, would present a theory that she in no instance was at fault, but the State was not compelled to accept that theory. She shows that she desired to quit deceased, and says he threatened her life, and threatened to use this and another letter to take the children away from her, if she did do so. She says that once she desired to telephone for an officer and he threatened her life if she did do so, and she was in mortal dread. She says that the trouble came up the last time about a letter deceased had found, that he charged her with receiving, which, if true, showed her infidelity. In the record is the testimony of Henry Magill, who testifies: "Deceased and I were in business together in 1902 and 1903. I heard Mrs. Streight (defendant) in the office say that if Mr. Streight ever accused her of being untrue to him again she was going to kill him, if she had to do it at night while he was in bed." Again, Mrs. Mollie Wood testifies: "Mrs.

Streight came to my house in the latter part of January or first of February this year (1910). She asked me if any of her letters were among the effects of Johnnie Johnson. He had died. I told her I did not know. She told me if I would go to Kopperl and see if there were and get them and bring them to her she would pay my way. She said, 'There is going to be a tragedy in my life and that is all there is out against me and I want to get them in.' "

Under all the evidence in this case, and especially the evidence of defendant, we have arrived at the conclusion that the letters introduced tended to shed light on the homicide, the causes leading up to it, and if the defendant was guilty of any offense, of what degree of homicide she was guilty. The letters, perhaps, would not have been admissible, except in the light of her testimony, but when we view the case from the standpoint of what she says and the other facts and circumstances in evidence, the court did not err in admitting them in evidence.

20. The State in rebuttal, for the purposes of impeachment, introduced excerpts from the testimony of Tom Evans, Mrs. Tom Evans, Henry Evans, Miss Fredda Streight and of defendant, given at the habeas corpus trial, and from affidavits made in the grand jury room and before the county attorney. When the State introduced these excerpts, the defendant then offered to introduce the other portions of such statements. It is the well settled rule in this State that when part of a statement is offered in evidence, all a witness says on that point is admissible. If the remaining portion would show that the statement was in substance the same as that made on the trial, it is proper to admit all that would so tend to show, and it is not proper to permit isolated questions and answers to be selected out and introduced, and then refuse to let the remainder be introduced. It is also well settled that when a witness is sought to be impeached by proving contradictory statements, then such witness can be supported by showing that she made the same statement, as she makes on the trial, in a former recital of the matter. These were the main witnesses for defendant, and this action of the court was very material error.

21. There are several objections in the record to the action of the prosecuting officer in conducting the examination, and remarks made during the examination. This court has strongly condemned what are termed side-bar remarks heretofore, and counsel for both State and defendant should desist from such practice in the trial of cases. We felt called on recently, on account of the prosecuting officer repeatedly asking the same or similar questions after the court had ruled on the matter, to reverse a case, and counsel for the State should be careful to ask only such questions as they think are legitimate and will elicit legitimate testimony, and so conduct the examination as to give no just cause for complaint, and to make no side-bar remarks that might be construed as an attempt to testify.

22. There are a number of other assignments in the motion that

we do not deem necessary to refer to in view of the disposition of the case, but there is one matter that we feel we should caution the trial judges in regard to—the action of the court in disposing of the application for a writ of habeas corpus. It appears that on September 29, 1910, defendant filed her application for a writ of habeas corpus, and on October 3, 1910, the judge entered an order granting the writ, and set it down for a hearing on October 11. At the time this action was taken the main case had not been set for a day certain, but thereafter the court set the case of defendant on the same day he had set the hearing of the application for writ of habeas corpus. On the 11th day of October the defendant appeared and asked that her application for a writ of habeas corpus be first heard, that she might be on bail, if entitled to it, during the trial of her case. This was refused by the court, and the court required the defendant to announce ready in the main cause without hearing the application for habeas corpus. Defendant reserved a bill of exceptions to the action of the court, moved to continue the case, because of this action of the court, among other things, and in a number of ways has brought this matter before us for review. The learned judge who presided in the matter gives his reasons in a qualification to the bill, saying:

"That defendant's counsel, after the indictment had been returned, made application for writ of habeas corpus and the court set the hearing of said writ of habeas corpus for the same day that he set the case down for trial on its merits, the court knowing all of the facts at the time, having heretofore tried the defendant on habeas corpus, and heard all the testimony that was introduced in that trial, which testimony was practically the same as the testimony in the trial of the facts with the exception of the testimony of threats and abuse alleged to have been made towards the defendant on the part of the deceased, and refused her bail on said testimony; and also knowing from the previous habeas corpus trial that another habeas corpus trial would consume many days and possibly weeks in its trial; in fact, practically as much time as the trial of the case on its merits, and the court set both the writ and the trial on the merits down for the same day."

How the judge before hearing the case on its merits could know in advance that the evidence would be practically the same as on the former hearing or habeas corpus is past our understanding. That the action of the trial court in this instance was virtually a denial of the writ of habeas corpus, none can gainsay. If the judge was so pressed with business as to be unable to hear same, he should have so endorsed on the writ and let the application be presented to another judge.

Article 1, section 12, of the Constitution, provides: "The writ of habeas corpus is a writ of right and shall never be suspended. The Legislature shall enact laws to render the remedy speedy and effectual." The Legislature, in obedience to this command, in articles 150 to 214 of the Code of Criminal Procedure, has hedged about this supposed

bulwark of human liberty with almost every statutory demand calculated to its full enforcement and preservation to the citizens. Not only has the Legislature attempted to obey this instruction in letter and spirit, but it has made it a penal offense in almost every conceivable instance where an attempt could be made or is made to evade its effect or deny its protection. To the courts alone is intrusted the solemn duty of assuring and securing to the citizen these reserved rights.

She stated in her application to the trial court, and she stood before that trial court and insisted that her case was bailable under the law and the facts, and stood ready to be heard thereon, and she was entitled to a hearing after the application had been granted.

Under articles 635 and 636 of the Code of Criminal Procedure, a defendant on bail is entitled to remain on bail during the trial, and it has been held, in a recent case by this court, that an improper denial to a defendant on bail of the right to remain on bail during trial, is a denial to him of a substantial right and is reversible error. Choice v. State, 52 Texas Crim. Rep., 285.

We have not seen a copy of the decision of the Appellate Court rendered in the case of Dr. Hyde, of Kansas City, charged with murder and sentenced to life imprisonment, but a report of the decision shows that the case was reversed because the defendant was improperly confined in jail during his trial.

In the case of the State v. Williams, 39 L. R. A., 821, it is said: "It was the ancient rule at common law that a prisoner brought into the presence of the court for trial upon a plea of not guilty to an indictment was entitled to appear free of all manner of shackles or bonds; and, prior to 1722, when a prisoner was arraigned or appeared at the bar of the court to plead, he was presented without manacles or bonds, unless there was evident danger of his escape. 2 Hale, P. C., 219; 4 Bl. Com., 322; Layer's case, 16 How. St. Tr., 4th ed., by Hargrave, 230, 231, 244, 245; Waite's case, 1 Leach, C. C., 33. In J. Kelyng's Reports (pleas of the crown adjudged in the reign of Charles II.): 'It was resolved that when prisoners come to the bar to be tried, their irons ought to be taken off, in that they be not in any torture while they make their defense, be their crimes ever so great. And accordingly, upon the arraignment and trial of Hewler and others, who were brought in irons, the court commanded their irons to be taken off.' The common law of England was expressly adopted by legislative enactment at the first session of the legislative assembly of this territory, and there is no doubt that the ancient right of one accused of crime under an indictment or information to appear in court unfettered is still preserved in all its original vigor in this State. In State v. Kring, 64 Mo., 591, the prisoner was convicted of murder in the first degree. The plea of insanity was before the court, and the defendant had some three months before assaulted a person in open court. He was brought into the trial court manacled, and remained some time in that condition. The Supreme

Court, in reversing the judgment of conviction, observed: 'We have no doubt of the power of the Criminal Court, at the commencement, or during the progress of a trial, to make such orders as may be necessary to secure a quiet and safe one, but the facts stated by the court in this case, as shown by the record, that the prisoner had assaulted a person in court about three months before the term at which he was tried, would hardly authorize the court to assume that on his trial for life he would be guilty of similar outrages.   There must be some reason based on the conduct of the prisoner at the time of the trial, to authorize so important a right to be forfeited.   When the court allows a prisoner to be brought before a jury with his hands chained in irons, and refuses, on his application or that of his counsel, to order their removal, the jury must necessarily conceive a prejudice against the accused, as being in the opinion of the judge a dangerous man, and one not to be trusted, even under the surveillance of officers.   Besides, the condition of the prisoner in shackles may, to some extent, deprive him of the free and calm use of all his faculties.' Section 22, article 1, of our Constitution, declares that 'in criminal prosecutions the accused shall have the right to appear and defend in person.'   The right here declared is to appear with the use of not only his mental but his physical faculties unfettered, and unless some impelling necessity demands the restraint of a prisoner, to secure the safety of others and his own custody, the binding of the prisoner in irons is a plain violation of the constitutional guaranty.   None appears in the record.   1 Bishop, Crim. Proc., sec. 955; Whart. Pl. & Pr., sec. 540; People v. Harrington, 42 Cal., 165, 10 Am. Rep., 296; State v. Smith, 11 Or., 205."

In this case the defendant was not manacled, but she was carried backward and forward to the jail by officers of the law, placed on a cot in the courtroom during her trial, and kept under surveillance. No one can know what the effect of the court refusing to hear her application for bail had on the jury.   No one knows what effect the officers carrying her back and forth to jail, the jury thus seeing that she was kept in custody, had.   If the facts should show that defendant was entitled to bail, the remedy referred to by the Constitution, as applied to this instance, means and meant to this appellant that she might have her liberty under bail, especially during the trial, so that she would not be brought to and from the jail by officers in the presence of the jury with the odor of the jail about her, and the impression on the minds of the jurors that her case must indeed be grave that she was denied the right of bail, but held in strict custody; that she might have her liberty during trial that she might consult freely with her counsel; that she might come as a free person whose case has not yet been adjudged against her, and to sit facing the jury who were to pass upon her liberty and her life as a freeman.   These were valuable rights to her if entitled to them under

the law, and the habeas corpus hearing should have been held, and if entitled to bail under the law, that right granted her.

Of course, the court should not permit continuances to be secured by merely filing an application on the day set for trial of a case, or so short a time before that day as to render it impossible to hear it before the day set for the trial. But in this case the application was made almost immediately after indictment found and before the main case was set for trial, and the court should not then have deliberately set the case for trial so as to prevent a hearing on the habeas corpus matter. Upon a proper showing the habeas corpus should always be heard, but it should never be permitted to be so used as to continue a case. Our Constitution and laws guarantee to every person charged with crime a fair trial before an impartial tribunal, and to the judges and courts our people look for the rights of each and every citizen to be preserved. Guilty though this defendant may be, which fact we know not nor judge not in this opinion, yet she is entitled in the trial of her case to every right guaranteed to her under the Constitution and laws of this State, and this is our duty and the duty of the court trying the case to see that she receives. The court having granted the writ of habeas corpus, will now grant a hearing on the writ.

For the errors pointed out, this judgment is reversed and the cause remanded with instructions to the District Court of McLennan County to change the venue of this cause under the law in accordance with the application filed.

*Reversed and remanded.*

DAVIDSON, Presiding Judge.—I fully concur in the reversal of the judgment in this case. I think, however, that the letter mentioned as having been written in 1903, also the letter known as the Johnson letter, ought not to have been admitted, and that the judgment ought also to have been reversed on the exception to its admission. I may state some of the reasons later.

[Rehearing denied May 24, 1911.—Reporter.]

DAVIDSON, Presiding Judge (dissenting).—On a former day of the term I concurred in reversing this judgment. I still fully concur in that conclusion, but on motion for rehearing our attention has been directly and pointedly called to alleged error in the nineteenth section of the opinion in holding admissible in evidence certain letters. My brethren are still of the opinion the former opinion in this respect is correct. I have given the record, in the light of the motion for rehearing, a personal inspection, and have reached the conclusion that the letters should have been excluded. I am fully convinced, in the light of the personal inspection of the record and after a review of the authorities, that our former opinion should be reformed in the

respect mentioned, and that we were and are in error. in holding the letters admissible as evidence.

I have carefully read the motion for rehearing, and believe it sufficiently presents the issue both of fact and law, and will, therefore, adopt it for reasons why that portion of the opinion discussed should be reformed and changed as urged in the motion. Appellant has been fully conservative in stating the record, even more than favorable to the State's side of the issue. I hereby attach and adopt the able argument of Messrs. Williams & Williams, appellant's attorneys, as my opinion:

"Now comes the appellant, Minnie Lee Streight, and moves the court, in respect to the point hereinafter referred to, to grant her a rehearing and to reverse and reform its opinion upon the question determined in paragraph No. 19 of the opinion heretofore rendered by this honorable court, and for reasons say that the court erred in its conclusions and findings of fact upon which it based said paragraph of said opinion, and the court further erred in its findings of law applicable to the facts, and in admitting the letters therein referred to in evidence.

"1. No presumption of fact will be indulged in in order that testimony may be rendered admissible. 2. Where evidence tendered is prejudicial or inflammatory in character and is of little legitimate weight and probative character, it will be very closely scrutinized and unless clearly admissible will be excluded. Woodward v. State, 42 Texas Crim. Rep., 204; 6 Enc. Evidence, page 606; Tomlin v. State, 25 Texas Crim. App., 685. 3. Where testimony of threats, quarrels or former troubles between the deceased and defendant at all remote in time is offered in evidence, and it is shown that there had been a reconciliation between the parties thereafter, such testimony is excluded and the law presumes that the fatal difficulty grew out of the new trouble or provocation, if any is shown. 'Repeated quarrels may be shown between the parties to establish the malo animo, but you can not go back to a remote period and prove a particular quarrel or grudge unless it be *followed up with proof of a continued* difference *flowing from that source.'* 6 Ency. Evidence, page 592; Ross v. Commonwealth, 21 Ky. L. Rep., 134, 55 S. W., 4; McAnear v. State, 43 Texas Crim. Rep., 521; Wakefield v. State, 50 Texas Crim. Rep., 125; Wilburn v. State, 77 S. W. Rep., 3. 4. Evidence tending to show infidelity upon the part of the wife accused of a homicide, seven years prior to the homicide, is so remote in time that the law will presume her reformation and fidelity. French v. State, 47 Texas Crim. Rep., 572. 5. Letters of the character introduced in evidence are never admissible unless it be *proven* that they formed the basis for action and in this case unless it be proven that they were the moving cause of the homicide; and in this connection no presumption will be indulged in against the appellant.

"Our criticism upon the inaccuracies and unwarranted findings of

, fact by this court strike with equal force as a boomerang upon counsel for appellant, who at the time that the case was submitted so insistently urged that this court pass with such dispatch upon this voluminous statement of facts.

' "The court passing upon this question finds as a fact, and upon which its conclusions of law are based, the following: 'By her (appellant's) testimony it is shown that the family troubles, if family troubles there were, were caused by the belief of deceased in her infidelity. If her testimony is true, he had cursed her because of this belief for a period of more than ten years. They were separated about the period the letter was written to Wood, and the cause of this separation was deceased's opinion that she was untrue to him. . . . She shows that she desired to quit deceased, and says he threatened her life, and threatened to use this and another letter to take the children away from her if she did do so.'

"Based upon this conclusion of fact, the court says in the opinion: 'Under all the evidence in this case, and especially the evidence of defendant, we have arrived at the conclusion that the letters introduced tended to shed light on the homicide, the causes leading up to it, and if the defendant was guilty of any offense, of what degree of homicide she was guilty. The letters, perhaps, would not have been admissible, except in the light of her testimony, but when we view the case from the standpoint of what she says and the other facts and circumstances in evidence, the court did not err in admitting them in evidence.'

"We desire to call the court's attention briefly to what we think are clearly erroneous findings of fact, caused evidently by the court attempting to summarize in his mind and digest this voluminous statement of facts in the short space of time that was necessarily consumed and devoted to a consideration of it.

"The first finding 'that the family troubles were caused by deceased's belief in the infidelity of his wife' is wholly without support in a detailed consideration of the record. The testimony of Mrs. Streight, quoted in the opinion, does not at any time infer, except in two specific instances, one seven years ago in Ft. Worth, and the other during the last week of the homicide, that her husband ever accused or thought her guilty of infidelity, and in fact her testimony as to the Ft. Worth incident shows that he did not really believe her guilty at that time or in that instance.

"The other conclusion 'that he cursed and abused her on account of this belief for ten years' is also unsupported, as is also the conclusion that they separated at the period the letter was written to Wood and that the cause of their separation was deceased's opinion that she was untrue to him.

"The testimony also developed affirmatively that at the time the letters in question were discussed between them in Ft. Worth that there was a perfect reconciliation between them and that they lived

together peaceably and happily for at least five months and for an indefinite part of one year in addition to this.

"We refer to the testimony of the different witnesses briefly upon these points. S. F. (Mrs. Streight's testimony), page 101, shows that after going to McGregor she worked in the office with him a year and he became so disagreeable that she quit working there, and that as years went on he became more so.

"The court seems to have entirely misinterpreted one transaction in her testimony (S. F., 101-102) relative to the time that he drew a pistol on her, and seems to have concluded that this was on account of his belief in her infidelity. The above pages of the statement of facts show that she was expecting a telephone message from her cousin, John McLain, an attorney, who lived in Llano, and who had passed through McGregor on his way to Cleburne, and was to phone back and stop off for a visit on his way back. That the appellant expecting the phone message one afternoon, notified central that if a long distance call came for her to send the message up to her husband; that they were both expecting this telephone message and he seemed as anxious to see her cousin as she did, and there was no question of jealousy there. When he came home to supper he asked her if she had gotten the long distance call. She said no, that she had been uptown shopping, and he became angry and cursed her for a liar and told her that she ought to have been at home attending to her business, etc., and called her other vulgar and vile names, and that he was in the habit of calling her a bitch and a slut and a whore, and that on this particular occasion she started to the telephone to call an officer and deceased got his pistol and said, 'If you ever attempt to call an officer I will kill you and the officer.' That deceased went to the front door to close it and appellant slipped out the back door and through the side gate to a neighbor's and fell on the porch. There was no question of infidelity in regard to this, or does it appear to have been with reference to anything else, but was simply one of his cursing fits. He would just get so mad that he appeared to be insane and had the expression of a maniac and she was afraid of him. S. F., 103.

"Another specific occasion referred to (S. F., 104), which took place in the presence of Miss Mai Belle Neff, started 'because the coal oil cup was out of place. When he went to make fire for breakfast he could not find it and came back to my bed and asked me where it was.' He then cursed her for vile names and took her by the throat and choked her and she was confined to her bed for several days. He started to strike her with a stick of wood. There was no supposition of infidelity in regard to this. Miss Mai Belle Neff and Miss Fredda Streight both testified to this same incident.

"S. F., page 105, appellant testified: 'I am not sure what the Sunday morning encounter started about. It was some trifling mat-

ter. I can not tell what it started about because they were so numerous and the causes were so trivial that I can not recall them all.'

"S. F., 106, shows an instance where he became furious and cursed and abused her for all of these vulgar and outrageous names because she had bought some lemons without his permission, and he took the sack of lemons and emptied it in the most violent, frantic manner on the floor and mashed them with his feet all over the floor and got down with his hands and mashed them, and dared her to ever buy anything else in town. On the same page is another incident where deceased went to the kitchen to put the breakfast food on one morning. The vessel turned over on the floor; he became angry and threw the whole thing in the backyard cursing, and because appellant laughed he came in and abused her and cursed her. She then says on this same page, 'Those instances that I have given are fair illustrations of our morning meals for the last six years there in McGregor. He often became angry because there would be a button off his clothes, or the buttonhole not the size it should be. He would become violent and abuse and curse me about it and 'tear up his collar and his underwear and throw them away.' That she worked in the office with him doing ordinary mechanical labor, she understanding typesetting, during the first year of their life at McGregor, and that she quit the office because he became so disagreeable and unpleasant in the office, and that beginning with the threats and abuse of her and her children at that time they finally rendered her a physical wreck. The clear inference being that the greater part of the first year of their life in McGregor they lived peaceably, which, as we will later show, was but a continuation of the five or six months intervening between the letter incident at Ft. Worth and their arrival at McGregor.

"Now we say that this record of appellant's testimony shows that deceased cursed and abused her and the vile epithets that he applied to her all grew out of ordinary everyday domestic affairs and the deceased's ill temper and nothing else. That nowhere in the record is there a single incident of anything else except the conclusion as to the Ft. Worth incident and the few days immediately preceding the homicide, and the Johnson letter was never known to the deceased in any manner.

"While the deceased cursed and abused appellant for a slut, bitch, whore and chippy, it is not shown that he used these terms as an accusation, but on the contrary, he would use them on occasions when he would get mad about some small domestic affair, as abusive language and vent to his temper. He seems to have used substantially the same language to his young daughter. It has been frequently held by this court that calling a man a son-of-a-bitch is not a reflection or insulting language or conduct toward a female relative reducing the homicide to manslaughter, but is purely an opprobrious and insulting epithet without meaning. The same rule would apply to the

language of deceased toward his wife when there was no indication for or occasion of an accusation against her character.

"The other material witnesses upon these points, material in the order in which their names appear, are Mrs. Ida Baldwin, S. F., 149-166; Miss Fredda Streight, S. F., 173-198; Glenn Streight, S. F., 216-238; Ben Kelley, S. F., 199; Miss Mai Belle Neff, S. F., 202-215; Mrs. M. H. Rayburn, S. F., 248-254; Miss Ruth Rayburn, S. F., 239-248. None of these witnesses at any point contradicted appellant upon the causes for the frequent outbreaks of temper upon the part of deceased, but on the contrary corroborated her in detail.

"Appellant never testified that the cause of their separation at the time she was in Ft. Worth grew out of any question of infidelity on her part, but was on account of his mistreatment of her, and upon this point appellant's sister, Mrs. Baldwin, S. F., 154, also says that appellant wrote her from Shawnee, where they were living, of deceased's bad treatment of her and her fear that he was going to kill her and the children, and that the witness, who was living in Ft. Worth then, wrote appellant and sent her the money to come to Ft. Worth with her children, and that appellant came to Ft. Worth in answer to this letter, and they all kept house there together until deceased came some time later. That deceased came some time between Thanksgiving and Christmas. That she advised appellant not to go back to him, but that she did, and they all lived there in the house together until the house burned the first week in February and for about ten days after that. 'During that time he was very nice to her. They then went to visit my father, and stayed with my father, I think, about a month or six weeks.' S. F., 155.

"This testimony, in connection with Fredda Streight's, daughter of deceased, which follows, shows that there was a complete reconciliation which lasted about two months at Ft. Worth, a month or more at appellant's father's, and then a month or more at McGregor.

"Fredda Streight, S. F., 180 to 181, said they went from Ft. Worth to Cleburne and lived there about three months. She says deceased did not curse her mother while at Cleburne. 'We lived at Cleburne. I do not think he cursed her. . . . He seemed to be all right then. I think he had a farm. I think everything went on smoothly at Cleburne. I do not remember any abuses.' That they then went to McGregor and lived out in the edge of town. 'We seemed to get along pretty well out there. We lived out there a month. I do not remember whether he cursed and abused my mother any out there that month or not. . . . It always made an impression on me when he did that. I can not remember him doing that at that time. . . . It seems to me that we were getting along nicely when we were up there.' She says they then .moved to another house. 'That at first he did not curse and abuse me any there. He cursed and abused me some. ˙ He would do that for just some trifle maybe that I would do.' In her testimony, S. F., 173, she says: 'He would get mad about

trifles most of the time. Sometimes he would get mad because there was not something on the table he thought ought to be there, etc., . . . and maybe from something that way he would raise the greatest row that would be absolutely unnecessary.' He abused the witness and her little brother for all character of names, knocked him down. 'He would get so mad sometimes that we could not say anything to him. He would tell us not to come near him, that he was liable to hurt us when he was so mad. He would say that himself and go shut himself up in his room.' S. F., 175.

"On this page witness also tells of a specific instance of where he got mad at her mother, but never in any case is there any intimation of their trouble growing out of appellant's infidelity.

"As to appellant's feeling towards deceased, she says: 'I loved Mr. Streight when he was kind to me.' S. F., 119. Bill of exceptions No. 35 shows that she continued to live with him not through fear of any letters, but on the advice of her cousin, John McLain, to whom she stated all the facts relative to his treatment. In her entire testimony she speaks frequently of being afraid he would kill her and afraid to leave him on that account, but never at any time during the last seven years gives as her reason for living with him anything about those letters. In fact, her statement about those letters, as quoted in the opinion, does not make them a continuing menace or a continuing threat, but a threat in the present to be then executed if she did not return to him, and after the reconciliation, so far as this record is concerned, and so far as presumptions of law relative to remoteness, reformation and time, they became and were a past and closed incident in her life and presumably in his. The court can not presume in the face of the record that those letters were ever mentioned between them again, but appellant had the right to presume, and evidently did presume from the record, as deceased had continued to live with her, that the letters were destroyed and no longer in existence. In fact, the witness Mrs. Wood testifies that appellant told her some few months before the homicide that there was a letter she had written Johnnie Johnson that she wanted the witness to get because her life was going to end in a tragedy and this was the only thing out against her. S. F., 302. Here we have appellant's plain assertion introduced by the State that neither the Wood letter or other Ft. Worth letter were in her mind, but on the contrary, she thought they had long since been destroyed. Deceased never knew or heard of the existence of the Johnnie Johnson letter. In fact, there was no Johnnie Johnson letter, but it was written to his brother, Walter Johnson, and may have been inspired by pure motives. It was written while Johnnie Johnson was on his death bed and only two days prior to his death. S. F., 375.

"There is absolutely no evidence in the record that deceased was ever jealous of Johnnie Johnson. There may have been some misconception with reference to the witness Cunningham and as to the de-

ceased being jealous of him, but such from the record is not the case. Cunningham was a next-door neighbor; owned the house that deceased lived in (S. F., 47), and came on the premises for rent or other legitimate purposes. He was not even a friend of appellant's, as is easily seen by his testimony in the statement of facts. Cunningham and his wife were both present in attendance upon Mrs. Streight when she was sick (S. F., 47-48), and it was at the end of this visit that Streight made the remark about what in the hell is Cunningham doing here. There is nothing in this record from which any inference can be drawn that Streight was jealous of Cunningham, or had any reason to be, and in fact the entire record refutes this idea.

"Taking up again the question of the occasion for quarrels and whether they grew out of deceased's belief in the infidelity of his wife, as asserted in the opinion, Ben Kelley testifies that deceased was constantly cursing and abusing his wife for the vile names set out in the statement of facts, most frequently at the breakfast table. 'He would get mad at almost nothing.' The way the breakfast was fixed, such as that, or maybe the children would not put sugar on the breakfast food. The least little thing. Nothing almost he would get mad at. S. F., 199.

"Miss Mai Belle Neff testifies to an incident on page 204 of the statement of facts, and on page 205 corroborates appellant's statement about her running away from home and falling on Mrs. Neff's back porch on the night that the fuss grew out of the John McLain telephone matter. She says further: 'I have been there quite frequently when he abused them and cursed them about small things.' S. F., 205.

"Glenn Streight, son of deceased, testifies that deceased would fuss and quarrel at the breakfast table about every little thing, and that he had seen him assault his mother and choke her. None of these things grew out of any belief in her infidelity. S. F., 217. He also corroborates his mother about the John McLain telephone incident. S. F., 219.

"Ruth Rayburn, S. F., 240, lived with them two years, testifies in regard to seeing assaults upon appellant and hearing deceased curse and abuse her, and says: 'He was angry; I could not answer definitely what it occurred about, but I think it was because Glenn had not done something the day before that he wanted him to do. He struck her for that. . . . He would curse her and call her vulgar names almost every morning.'

"Mrs. M. H. Rayburn lived with them two years, the same time as her daughter Ruth, and gives substantially the same testimony and says that one time he assaulted her, it was on a Sunday evening when she wanted to go to church and he told her she could not go, and she said she would go and got up and left the room. The balance

Vol. LXII Crim.—31.

of her statement is to the effect that he ran, overtook and assaulted her. S. F., 249-250.

"All of these witnesses testified to the same character of treatment and abuse by the deceased to his son and daughter and calling them the same names in substance.

"All of this testimony absolutely destroys the whole theory upon which this court based its conclusion that these letters were admissible. The evidence shows: First, that there was no threat with reference to the letters; second, that there was a complete and perfect reconciliation after the letter incident, which lasted from five months to a year and that neither the letters nor the incident nor the party to whom they were addressed were ever afterwards referred to, nor were they assigned as a reason for any conduct of either the deceased or appellant. This evidence further shows that the family fusses, or rather the abuses and assaults of deceased upon appellant, did not, as asserted, grow out of his belief and accusations against her of infidelity, but out of ordinary domestic relations and affairs. This is conclusively established and utterly destroys the only theory upon which these letters were held admissible.

There is another proposition we want to assert and that is that no conduct or belief of deceased should render admissible and keep alive these letters, but their admission or rejection must be controlled wholly by the acts, declarations and proved convictions of appellant, and from that standpoint we have a closed incident with reference to these letters from the date they were mentioned the one time in Ft. Worth seven years ago until dragged out of appellant upon cross-examination and over her objection on the witness stand. She was not further during the trial physically able to be examined on re-direct, but this record conclusively shows that these letters and the persons to whom they were addressed were wholly out of her life and did not form the basis of any word, act or deed on her part during the entire hiatus of seven years. This is most conclusively proved by her repeated assignments in her testimony of reasons for her actions and conduct, never once assigning these letters as such. The burden is on the State to show that these letters did have some bearing upon this homicide, were in mind at the time of the homicide, and in a measure controlled or influenced the action of appellant. This can not be presumed, but it must appear from evidence to be true. A surmise or possibility will not justify the admission of such inflammatory testimony as this is admitted. Presumption of innocence obtains for the accused by statutory command. Rulings of courts should uphold the statute, not overthrow it, or by indirection destroy it.

"In Woodward v. State, 42 Texas Crim. Rep., 204, defendant was charged with killing J. H. Ragland. The witness was permitted to testify that twelve years prior to the homicide defendant told him that Ragland had been guilty of incest with his sister. The court held,

'We think the testimony was entirely too remote. It does not tend, as we understand the record before us, to elucidate or explain any mental condition of· appellant at the time of the homicide; nor does it indicate that out of this conversation . . . any animus against the deceased had grown upon the part of appellant. It was of a very highly prejudicial character.' The evidence is held not admissible. Some other evidence was admitted in this case of more recent mistreatment and assaults by the defendant on the mother of the deceased and the defendant being armed at the home of the mother of the deceased. The court held that this testimony 'is too remote to pertain to any issue raised in this case.' And in this case it seems that there was some evidence that there was a continuing state of ill feeling upon the part of appellant toward deceased.

"In McAnear v. State, 43 Texas Crim. Rep., 521, only two years had elapsed since the brother of appellant had a fight with deceased, and the State was permitted to prove this and the evidence showed that after the fight the defendant and his brother again became on friendly terms with the deceased and remained so up until the day of the homicide. The court said: 'We think this testimony is too remote. It does not serve to show animus on the part of appellant or his brother towards deceased and should not have been admitted.'

"In Tomlin v. State, 25 Texas Crim. App., 684, defendant was convicted of rape, and the State was permitted to prove, over his objection, that five years before the trial appellant told a witness that he, appellant, had a medicine which if administered to a woman would make her yield to his desires. Judge Hurt, speaking for the court, uses some rather strong language with reference to the introduction of testimony of this character and his opinion is well worth on principle the time it will take this court to read it. He holds that this testimony might show that the appellant was a libertine and a rake, but nevertheless it was not legal evidence and was highly prejudicial and placed appellant before the jury a confessed rake and libertine capable of any crime to which he might be prompted by his ungovernable passion, and that it was strongly calculated to prejudice appellant with the jury. The case is reversed on this point. And so these letters in this case placed this appellant, if believed, before the jury in the attitude of an unfaithful spouse, lax of virtue and fickle of heart; was highly inflammatory. Its only effect was to influence and prejudice the minds of the jury against her, because it was not shown, as is required, that these letters or that Wood or anything connected with her life seven years prior to the homicide, had anything to do with her actions upon the night of the homicide or were in her mind. And, as above stated, presumptions or possibilities will not be indulged to render this highly inflammatory testimony admissible. If there is any question about it as to the facts being sufficient to demand its admission as explanatory of the conduct and as neces-

sary to an understanding, the courts have frequently said that testimony of this character should be rejected.

"In Wakefield v. State, 50 Texas Crim. Rep., 125, appellant was charged with homicide and the State was permitted to show that a year before the homicide appellant's mother attempted to induce the witness to kill the deceased in order to get his money. The court says: 'We suppose this was admitted upon the theory that there was a conspiracy between appellant and his mother to kill the deceased. Under the facts in this case we do not believe this testimony was admissible. It was too remote, and so far as we are able to ascertain from this record had nothing to do with appellant's connection with the homicide. It may have shown that at the time Mrs. Hill made this statement she was feeling unkindly towards her husband, the deceased, but they lived together afterwards for a year and appellant was living not far away. The evidence shows that whatever the cause the State may have had grew out of matters occurring upon the evening and just preceding the homicide.' The facts in this case show the homicide grew out of matters occurring within the week, and it is not shown that the letters had any connection with the homicide.

"In French v. State (an adultery case), 47 Texas Crim. Rep., 572, it was held that familiar and indecent conduct between the defendant and his paramour five years before the prosecution was not admissible. The court says: 'But appellant raises the question of remoteness as to the acts of familiarity proven here antedating the offense some four or five years. We hold that said acts of intimacy are too remote. There was ample time for the parties to have reformed or to have become estranged.' It seems to us that this language applies with great force to the facts in this case and that the evidence rejected there came much nearer within the field of legal testimony than that admitted here.

"We respectfully submit that this paragraph No. 19 of the court's opinion should be so reformed as to exclude this highly prejudicial and questionable testimony by which this appellant has been and may likely again be convicted on a charge of murder upon evidence of infidelity. Let her stand her trial upon the charge of murder before a fair and impartial jury upon the legitimate testimony surrounding the homicide and shown to have some bearing upon it.

"Upon the reformation idea we call the court's attention to the fact that even when it is sought to impeach a witness by showing that he was guilty of a felony five years or seven years before the date he is testifying, that *unless the State shows* that he has since that time followed up the course of crime, a conviction will be held too remote to reflect upon his character and the law will indulge the benign presumption that he is a reformed man.

"With due respect and worthy courtesy to this court, we present this our motion to reform the 19th paragraph of the opinion of the court, again admitting to ourselves as much fault in our insistence

upon haste as could possibly attach to an overworked court. The court may readily understand that we regard these matters as of greatest importance or else we should not attempt to burden you with a reconsideration of them and our client with consumption of unnecessary time..

"We respectfully request that the 19th paragraph be reformed."