## LEE McANEAR v. THE STATE.

### No. 2440.   Decided March 5, 1902.

**1.—Consolidation of Prosecutions—Practice.**

Because the statute limits the fee of the district attorney where parties can be jointly indicted for the same transaction to but one fee, this affords no reason why, nor does it require that, the prosecutions of different defendants separately indicted for the same transaction should be consolidated and tried jointly.

**2.—Murder—Impeachment of Witness.**

On a trial for murder occasioned by the insulting conduct of deceased to the sister of defendant, it was competent on the cross-examination of a witness and for purposes of impeachment to ask him, and have him answer, whether or not, a short time before the killing, deceased had not stated to him that he, deceased, being a married man, had a better chance or showing with young girls than young men for the purpose of being intimate with them.

**3.—Same.**

The testimony mentioned in the foregoing paragraph would also be admissible as original evidence, and it was error to exclude it.

**4.—Murder—Evidence Too Remote.**

On a trial for murder, testimony to the effect that a brother of defendant and the deceased had fought about two years prior to the homicide, was too remote; especially in view of the facts that subsequently the parties had become friendly and remained so up to the very hour of the killing.

**5.—Bill of Exceptions.**

Objections stated in a bill of exceptions are not certified to be true simply because the judge certifies to the bill which states such objections were urged.

**6.—Murder—Evidence—Letters.**

On a trial for murder, where the defence was the illicit relations of deceased with the sister of defendant, letters found upon the body of the deceased shortly after the killing, and those also found in his trunk, having relation to the illicit connection of the parties, although the existence and contents of such letters were unknown to defendant before the shooting, were legitimate evidence in his behalf provided they were sufficiently identified as having been written by the parties.  Such letters would be strong and cogent corroboration of the testimony of defendant and his sister as to the existence of the illicit relationship between the parties.

**7.—Same—Insults to Female Relative—Charge.**

On a trial for murder, where it appeared that defendant, having become suspicious of deceased's infamous conduct towards his sister, went to the house of deceased to ascertain the truth of the matter, and there told deceased of his suspicions, who replied:  "Yes, by God, it was me, if you want to know the truth about it;" whereupon defendant shot and killed him, the court should have instructed the jury that if they believed such facts then defendant could not be guilty of any higher grade of offense than manslaughter.  Following Richardson v. State, 28 Texas Criminal Appeals, 216.

**8.—Manslaughter—Insults to Female Relative—Charge.**

Where it is shown that a homicide was occasioned by defendant's information of insulting conduct of deceased towards a female relative, the real test of defendant's motive and conduct is, whether he in fact believed that deceased was guilty of such conduct, and not whether, in fact and truth, deceased was guilty; and it is improper, in such case, to charge the jury that it must reasonably appear from the evidence that such conduct was the real cause of the killing before they could reduce the homicide from murder to manslaughter.

Appeal from the District Court of Red River.   Tried below before Hon. Ben H. Denton.

Appeal from a conviction of murder in the second degree; penalty, five years imprisonmnt in the penitentiary.

Appellant was charged by the indictment, with the murder of Ernest Hunter, on the 11th day of July, 1901, by shooting him with a pistol.

The opinion states the essential facts in the case.

*Chambers, Doak & Kennedy* and *Johnson & Chambers,* for appellant.

*Rob't A. John,* Assistant Attorney-General, for the State.

BROOKS, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of five years.

The following are substantially the facts adduced upon the trial: Appellant and his brother, Bob McAnear, were separately indicted for the murder of Ernest Hunter. The killing occurred on the 11th day of July, 1901, at deceased's home. Deceased was bookkeeper in the store of Hacker, Farris & Co., in the town of Clarksville. Appellant lived a short distance in the country, and his brother Bob lived in town. Appellant's mother and father were away from home on the day of the killing, and he had charge of the home and the care of his sister, Lula McAnear. Appellant discovered a letter addressed to his sister, written on the letterhead of Hacker, Farris & Co., in his sister's bureau drawer, and upon reading the same found its contents indicated, or tended to indicate, undue intimacy on the part of some one with his sister, as said letter contained protestations of love and referred to the love as an "unholy love." The letter was not signed. The general tenor of the letter convinced appellant that a married man had written it. Several married men worked in the store of the firm named. A short while after reading this letter, one night appellant missed his sister from the house, and, after searching for her, failed to find her. On the next morning he approached his sister and upbraided her for her conduct, and begged her to tell him where she had been, and who was the author of the anonymous letter that he had read. She refused. Subsequent to this time, deceased, appellant and his brother all being on friendly terms, met in a saloon and drank together. Afterwards appellant informed his brother of the letter, and the improper absence of his sister on the night mentioned. Thereupon the two brothers decided to try to ferret out the author of the anonymous letter, and who it was his sister was absent from the house with. On the day of the killing appellant went into the store of the firm named, and discovered deceased talking with his sister. This, with the foregoing circumstances, aroused his suspicions, and led him to more strongly believe that deceased was the author of the letter. Prior to this, deceased had clandestinely taken appellant's sister from home, ostensibly to go to church, but they never arrived at church. This was at night. Appellant knew nothing of this until after the homicide, so far as this record shows. On the evening of the homicide, deceased

invited appellant and his brother to go home with him; deceased living seven or eight blocks south of the square in Clarksville. When they arrived there, deceased entered the house, followed by appellant and brother, picked up the feather bed and cover, remarked as he did so that it was too hot to sleep in the house, and dragged the same out on the gallery. As they reached the gallery, appellant said to deceased, just as he was making the bed on the porch: "Earnest, we did not come here to stay all night. You need not fix the bed. We have reason to believe that you are the party that has been writing to our sister, and who stayed with her all of Tuesday night." To which deceased replied, as he was straightening up from having placed the bed down, "Yes, by God! it was me, if you want to know the truth about it!" and, in his stooping position, turned his side in a threatening gesture, as ·if he was going to fight appellant. Appellant fired five shots at deceased, and his brother began shooting at the same time. Appellant testified that he shot deceased because he had ruined his sister, and because he thought he was going to fight him; that he knew deceased went armed, and thought he was armed at that time. Appellant further stated that he did not know for sure that deceased was the party who had been with his sister on that Tuesday night, until he said he had; and, the moment he said it, appellant began firing. Appellant stated he had no positive proof until deceased admitted his improper conduct, and that appellant went to deceased's home for the purpose of finding out whether or not he did have undue intimacy with his sister; but, if deceased had stated he was not the guilty party, appellant would not have hurt him. There are other circumstances in the record, but we do not think it necessary to detail them in order to make clear the questions to be discussed.

Appellant contends that the court erred in refusing to consolidate appellant's case with his brother's, both growing out of the same transaction. The court did not err in refusing to do this. The mere fact that, as appellant insists, there may be a statute requiring the district attorney to charge but one fee where parties can be jointly indicted, does not require appellant and his brother to be jointly tried. They could be separately or jointly indicted, and, whether separately or jointly indicted, a severance could be asked by proper affidavit under the statute.

Appellant complains that the court erred in refusing to permit a State's witness to answer the question, on cross-examination by appellant, as to whether or not he had a conversation in Hacker, Farris & Co.'s store, in the town of Clarksville, a short time before the killing, with the deceased, in which deceased stated to witness that he (deceased), being a married man, had a better chance or show with young girls than young men, for the purpose of being intimate with them; that "young ladies would not suspect him from the fact that he was a married man." Appellant insists this question was asked in order to impeach the said witness, and, if permitted to do so, he could have proved that said witness would have denied making the statement, and appellant could have proved by A. J. Farris that deceased did make said remark to wit-

ness. The witness Lane's testimony for the State is material, and, if appellant could have contradicted him on the statement indicated, it would have been proper to impeach him in the manner attempted by appellant. The witness Lane had testified substantially that he had never heard deceased say anything that tended to reflect upon Lula McAnear. Now, this testimony, in view of the last statement, would be proper in order to impeach him. Furthermore, this would be admissible as original testimony.

Appellant insists the court erred in permitting the State to prove by Tom Craig that about two years before the homicide, appellant's brother, Bob Anear, and deceased had a fight in a saloon in Clarksville. The bill presenting this matter states that appellant objected to this testimony "because the witness stated that defendant was not present at the time, and that the State had not shown, and did not show, that defendant knew anything about any difficulty between deceased and Bob McAnear, the brother of defendant." These are merely appellant's objections to the testimony, and not a certificate by the trial court that said facts are true. If appellant, as a matter of fact, was not present, and the circumstances are not such as indicate that he knew of the difficulty, and, adopting such knowledge, acted upon the animus that might have moved his brother, Bob McAnear, in the homicide, then, clearly, appellant's contention would be correct. However, in view of another trial, we would say that an examination of the statement of facts discloses that Bob McAnear and deceased had a fight about two years prior to the homicide, both being drunk, and that for a long time subsequent to said fight, and up to the very hour of the killing, Bob McAnear and appellant both were friendly with deceased. Hence we think this testimony is too remote. It does not serve to show animus on the part of appellant or his brother towards deceased, and should not have been admitted. However, in the shape the matter is presented in the bill, it does not constitute reversible error. In other words, we have repeatedly held that appellant's objections in the bills of exceptions are not a certificate by the judge that those objections are true. It is true that the trial court limits this testimony, if it was admissible, by a proper charge; but in the view we take of it, the evidence was not admissible for any purpose.

Appellant complains that the court erred in excluding from the jury the letters found on the body of the deceased, shortly after he was killed, shown to be in his handwriting and in the handwriting of Lula McAnear, sister of defendant, and in excluding the "cundrum" found by the officers on the person of deceased a few moments after he was killed. The trial court, in approving this bill, appends the following explanation: "That all the letters set out in the bill were found in the deceased's trunk after his death, except the second letter above set forth in this bill; and it was found on the person of deceased after he was killed, and none of the letters were shown to have been known to defendant before the shooting. And Miss Lula McAnear stated that she had not seen either one of the three letters set out in this bill, except the one she had written."

We do not think this explanation authorizes the exclusion of this testimony. If the letters were found in deceased's trunk, making protestation of love to appellant's sister, as the letters herein show he did, and the letter of his sister, being taken from his person, was written by her, this would not render them inadmissible. Certainly, if found upon the person of deceased, it would be a strong circumstance that deceased wrote the letters accredited to him, providing his handwriting was identified, as the bill shows it was. If they were found in his trunk, and the handwriting was identified, they would be equally admissible. The bill shows that if deceased wrote these letters, his conduct would be nothing short of infamous towards the sister of defendant, and the letter of appellant's sister appears to be equally reprehensible; and both clearly demonstrate, if true, appellant's motive for the killing. We know of no rule of law authorizing the exclusion of any evidence that makes manifest the guilt of a defendant, or that tends in the remotest degree to exculpate him. This testimony, as stated, if true, would have demonstrated to the jury, beyond any reasonable doubt, that the cause of the killing was the improper relation of deceased with appellant's sister. The fact that she testified to said relationship upon the trial, and the fact that appellant testified that deceased admitted the relation to him, would not be a basis or cause for the exclusion of letters found in his trunk or in his possession, where such letters are identified as having been written by deceased or by appellant's sister. Said testimony would be strong and cogent corroboration of the oral testimony adduced by appellant and his sister, and clearly should have been admitted. We therefore hold that the learned trial judge erred in excluding this testimony. Eanes v. State, 10 Texas Crim. App., 440. Appellant complains of the following portion of the court's charge on manslaughter: "If you believe that defendant, either alone or acting as a principal, together with Bob McAnear, killed Earnest Hunter, at the time and place alleged in the indictment; yet if you further believe that the said Hunter had used insulting words· or conduct of or concerning the defendant's sister, Miss Lula McAnear, and that the defendant had learned or been informed of such insulting words or conduct towards his said sister, and that this killing. occurred· upon the first meeting between the deceased and defendant, after being informed or learning of such insulting words or conduct, and that such insulting words or conduct created in the mind of defendant such a degree of anger, rage, sudden resentment, or terror as to render the defendant's mind incapable of cool reflection, and that such a state of mind did exist in the mind of defendant, and then defendant shot and killed deceased, he would be, if guilty at all, of no higher grade of offense than manslaughter. On the other hand, if you believe from the' evidence that defendant knew of such insulting words or conduct prior to the killing, and that having such knowledge, he met deceased, and that such killing did not occur upon the first meeting of deceased and defendant, after having learned of such insulting words or conduct, then if you do not find defendant justifiable under instructions herein given,

he could not be guilty of a less offense than murder." The court should have gone further and told the jury that, if defendant believed deceased had insulted his sister, or been unduly familiar with her, or had seduced her, and that, acting under such belief, he went to the house of deceased for the purpose of ascertaining whether or not his belief or suspicions were true, and deceased, when interrogated about said suspicions and belief, informed defendant of their truth, and upon being so informed by deceased, it produced in defendant's mind such a degree of anger, rage, sudden resentment, or terror as rendered him incapable of cool reflection, and that laboring under such passion produced by said cause, appellant shot deceased and killed him, then defendant could not be guilty of any higher grade of homicide than manslaughter. · As was said by this court in Richardson v. State, 28 Texas Criminal Appeals, 216 : "Suppose he did not kill him as soon as he first met him, but suppose that he doubted that deceased had or could have used such language, notwithstanding he had been so often told that he had; and that he determined to satisfy his own mind by asking him in person about it; and that, upon his doing so, the deceased repeated the language to him in person. Was not that a new and aggravating insult, and one doubly calculated to inflame his mind to such a degree of passion as to render it incapable of cool reflection? And suppose he acted upon that, and not upon the previous provocation, was that any the less an adequate cause because it was repeated to him in person? A man may well doubt that it is possible that another could have defamed his wife or mother until he has it confirmed from his own lips, and to hear him utter the defamatory language with his own lips is far more insulting than to have reports of such insults come at second hand from a thousand reliable sources. Some men, perhaps, under the circumstances would not have waited as defendant did, but would have slain deceased upon the information he had already received. This does not alter the question. If defendant asked the deceased out of the house for the purpose of ascertaining from him whether or not he had used the insulting language about his mother as he had been informed, and deceased, in reply to his question, stated that he had said and meant every word imputed to him, and that defendant, under the immediate influence of the sudden passion this insulting aroused, slew him, he would only be guilty of manslaughter, provided the jury believed the passion was such as to inflame his mind so as to render it incapable of cool reflection." The trial court's charge, as stated, should have embodied this phase of the law. And the limitations of this proposition, as contained in the charge, should have been eliminated. We do not deem it necessary to enumerate them. If appellant killed deceased for the insults to his sister, but the killing was not at the first meeting, it could not, under the statute, be manslaughter based upon insults to a female relative. This proposition is announced properly by the court. However, if appellant sought deceased for the purpose of ascertaining the truth of the defamatory statement, and learned its truth from the lips of deceased, and slew deceased, then the

killing might be manslaughter. These questions should be left to the jury by clear and succinct charges; and neither should be qualified by the other.

The ninth assignment complains of the following paragraph of the court's charge: "Before you can reduce the homicide from murder to manslaughter on the grounds or cause of insulting words or conduct about or concerning defendant's sister, it must reasonably appear from the evidence before you that the insulting words or conduct spoken or acted of or concerning defendant's sister, was the real cause of the killing." We do not think this charge should have been given, since appellant is entitled to a verdict of manslaughter, if the jury have a reasonable doubt whether or not defendant believed the insulting words or conduct, spoken or acted on, by deceased were true. It may not be true that deceased had acted as defendant believed; if he, acting under such belief, slew deceased at the first meeting, under the passion required by the statute, he would be guilty of manslaughter only, whether deceased's conduct had been reprehensible, in fact, or not. In other words, appellant's guilt must depend upon his own intent, and not the truthfulness or falsity of the facts about deceased's conduct. A charge embodying this proposition should have been given the jury.

For the errors discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*