## DETERMINED BY THE

# SUPREME COURT OF APPEALS

### OF

# WEST VIRGINIA.

---

## WHEELING

STATE *v.* WALDRON.

Submitted June 7, 1912.—Decided June 13, 1912.

1. HOMICIDE—*Evidence — Admissibility — Circumstances Preceding Act.*

   When self defense is relied on and there is some evidence that deceased was the aggressor, evidence of his recent act or acts of violence even towards third persons though uncommunicated to defendant, and so connected in time, place and circumstance with the homicide as to likely characterize deceased's conduct towards defendant, ought to be admitted to show the *quo animo,* for the question then is what deceased probably did, not what defendant thought he was going to do. (p. 3).

2. SAME—*Instructions—Degree of Offense.*

   Upon principles enunciated in *State v. Gravely,* 66 W. Va. 375, *State v. Taylor,* 57 W. Va. 228, and *State v. Clifford,* 59 W. Va. 1, an instruction that homicide proved or admitted is presumed to be murder in the second degree is not wholly inapplicable, though self defense be relied on and the facts and circumstances shown in evidence tend to justify the killing, and to reduce the offense to one of lower degree. (p. 10).

3. CRIMINAL LAW—*Trial—Instructions—Construction as a Whole.*

   The general proposition contained in an instruction that the law of self defense is the law of necessity, not limiting it to apparent necessity, but followed by the statement that unless the prisoner acted in the honest belief that it was then and there necessary to take the life of deceased in order to save his

   71 W. Va.

own life or free himself from some great bodily harm, he was not justified therein, and if the jury believed defendant though previously assaulted, used more force than was reasonably necessary to repel the assault or shot or continued to shoot after necessity for so doing had ceased, they could not acquit him, is not erroneous, for as a whole the instruction does limit the law of necessity stated to apparent necessity. (p. 11).

4.    SAME—*Trial—Instructions—Requests.*

An instruction that where there is more than one assailant, the slayer has the right to act upon the hostile demonstration of one or all of them and to kill one or all if it reasonably appears to him that they are present for the purpose of acting together to take his life or do him some serious bodily injury, is not erroneously rejected where the same proposition is substantially covered in another instruction stated in terms more particularly appropriate to the concrete case. (p. 12).

ROBINSON and WILLIAMS, JUDGES, dissent.

Error to Circuit Court, McDowell County.

John M. Waldron was convicted of murder in the second degree, and brings error.

*Reversed and new trial granted.*

*Wm. G. Conley,* Attorney General, and *Greever & Gillespie,* for plaintiff in error.

*Anderson, Strother & Hughes, Strother, Taylor & Taylor, W. P. Payne, Flanagan & Perry,* and *Sanders & Crockett,* for defendant in error.

MILLER, JUDGE:

On an indictment for the murder of Ben Tate defendant was acquitted of murder in the first degree, but found guilty of murder in the second degree, and the judgment below was that he be confined in the penitentiary for the period of ten years.

The homicide, admitted, occurred on the night of January—, 1910, a Sunday night, in a brothel in Keystone, McDowell County. Defendant was a deputy United States Marshal, who at the request of White, town sergeant, had gone with him to this house to make an arrest for alleged illicit sales of intoxicating liquors. While waiting the return of White from the Mayor's office with warrants, defendant, who before White left to secure the warrants, had been invited on the outside of the house by

Tate and his companion Gillespie, patrons of the house, and had declined, was on their coming out of the room of the mistress of this house, enticed by them into an adjoining room, where, almost instantly, the door being shut by one of them, the difficulty occurred, resulting not only in the death of Tate, but of Gillespie also, from pistol shots fired by defendant.

Defendant was the only living witness as to what actually took place in the room where the homicide occurred. He admitted the killing, but on his trial relied on self defense.

The controversy here is reduced to a few questions relating to the rejection of certain evidence proposed by the prisoner, and to the giving and rejecting of certain instructions to the jury.

First, as to the rejected evidence. On the trial, the prisoner, to establish his theory of self defense, was permitted to and did prove by the testimony of White that after he and White entered the house, and asked for the girl Blackburn, reported to have sold the liquor to Walter Waldron and Trivitts, Madge Murray, the mistress of the house, came out of her room and inquired of them, "Why do you all have me charged with selling whiskey and beer to-day?" and that another woman, Jennie Belcher, interposing said: "Make them show you a United States warrant before you go"; that the Murray woman then walked to a bed in the room, and to where, as he supposed, Tate was sitting on a chair, and sat down on his lap, and said to him: " 'Sweetheart, you are not going to let them take me, are you?' or something like that; and he said :—'No, not as long as we are here', and he raised up and pushed her off of his lap." This witness also says, that when Tate got up he walked around to the foot of the bed and stopped, and that witness said to him, we won't have any trouble, we will get a warrant, that he would go down and see Hale, the mayor, and get him up there and pull the whole house; that Waldron and he then walked out in the dance hall, where he wrote a note, proposing to send Waldron for the warrants, but after writing it concluded to go himself, as he thought he could find the mayor quicker. Continuing this witness says: "Then Mr. Tate walked around on this side, and Gillespie on this side (indicating), and touched him (Waldron) on the shoulder, and said he wanted to see him on the outside. He told him that if they wanted to see him, see him in here, and

'I don't see what business you have on the outside.' Gillespie spoke up and said they wanted to see him on the outside." Waldron himself, corroborates White entirely as to what occurred up to the time White left the house to go for the warrants.

As to what occurred immediately afterwards, Waldron further swears, and no fact or witness materially contradicts him: "As soon as Mr. White left they all went over to Madge's room and left me alone in the dance hall. I was standing there and in a short time two fellows came out of Madge's room and come up to me and the big fellow says: 'Come over in the room where you can sit down; its no use standing up', and pointed to the room right out across the little hall. There was a light in there and I just walked over, followed him. He walked right on in. I was behind him. I heard the door shut, and just turned my head that way (indicating) and the smallest one had his back to the door and this big fellow struck me.  *   *   *   *   *   *   * He knocked me down, I guess, the time he struck me. They both jumped on me and I caught on to the bed the best I could on it, then pulled myself up the best I could, trying to get my gun out all the time, shoved myself away from them," when he shot him, thinking he was in danger of being killed, or having great bodily harm done to him, his only reason for shooting.

In connection with this testimony and as further tending to show Tate and Gillespie were the aggressors, and establish his theory of self defense, the prisoner proposed, but was not permitted to prove, by two witnesses, Baxter and Hermanson, that but a few moments before the homicide, both Tate and Gillespie, in connection with two or three other men, were in a violent state of mind towards Hermanson; that but a few moments before White and Waldron entered the house Tate and Gillespie, as Baxter thought from their actions, acting under the influence of liquor, jumped on Hermanson, in aid of their lewd mistresses, and without other cause. beat him, while Hermanson was there waiting for two other women to come down stairs and pay him some money he claimed they owed him.

The attorney general and associate counsel justify the action of the court in excluding this evidence, not on the ground that it might not have influenced the verdict of the jury, but on the grounds, (a) that evidence of a single act of violence is not ad-

missible to establish the turbulent and violent character of deceased; (b) that the conduct of Tate and Gillespie towards Hermanson was unknown to Waldron, and if for no other was inadmissible for this reason; and, (c) because the conduct of Tate and Gillespie constituted no part of the *res gestae,* had no bearing upon or connection with the homicide, that there was no causal or even explanatory relation between that recent occurrence and the homicide.

In homicide cases, where the general character of the deceased for turbulence and violence is involved, the general rule, established by the weight of authority, no doubt is, that evidence of isolated facts or specific acts forming no part of the *res gestae,* and in no way connected with defendant, will not be received in evidence. 21 Cyc. 910, and cases cited in notes. But when self defense is relied on, and whereas in this case, there is evidence tending to show the deceased was the aggressor, the dangerous character of deceased may be shown by the facts and circumstances attending the homicide, and so connected with it as to constitute a part of the *res gestae.* 21 Cyc. 909; 1 Wigmore on Ev., section 363; *State* v. *Morrison,* 49 W. Va. 210, 218; *Harrison* v. *Com.,* 79 Va. 374. Moreover, Mr. Wigmore, 1 Wigmore on Ev. section 198, citing numerous cases, says: "When the turbulent character of the deceased, in a prosecution for homicide, is relevant (under the principle of § 63, *ante*), there is no substantial reason against evidencing the character by particular instances of violent or quarrelsome conduct. Such instances may be very significant; their number can be controlled by the trial Court's discretion; and the prohibitory considerations applicable to an accused's character, (*ante* § 194) have here little or no force." And whether in such cases as the one at bar there is necessity of showing defendant's knowledge of deceased's character, this writer, in § 63, referred to, says: "The reason for the hesitation, once observable in many Courts, in recognizing this sort of evidence, and the source of much confusion upon the subject, was the frequent failure to distinguish this use of the deceased's character from another use, perfectly well-settled, but subject to a peculiar limitation not here necessary,—the use of communicated character to show the fact and the reasonableness of the defendant's ap-

prehension of violence (*post,* § 246). As the purpose there
is to show defendant's state of mind, it is obvious that the de-
ceased's character, as affecting the defendant's apprehensions,
must have become known to him; *i. e.* proof of the character must
indispensably be accompanied by proof of its communication to
the defendant; else it is irrelevant. In the present use, this ad-
ditional element of communication is unnecessary; for the ques-
tion is what the deceased probably did, not what the defendant
probably thought the deceased was going to do. The inquiry is
one of objective occurrence, not of subjective belief. This dis-
tinction, however, was at first not always appreciated by the
Courts, nor clearly laid before them by counsel. Hence, a ruling
excluding the present use of the evidence cannot always be taken
as a repudiation of the present principle, but is often merely a
ruling that the offer does not satisfy the doctrine of communi-
cated character; and such a Court may in future recognize the
present doctrine if the distinction is pressed upon it. Apart
from a few such precedents, the principle is now generally ac-
cepted." This writer, same volume, section 248, substantially
repudiates the doctrine of some decisions, that particular acts of
violence if known to defendant ought not to be received in evi-
dence, on the question of defendant's belief of impending dan-
ger. "The fact," says he, "that the circumstance creating appre-
hension is a single act or series of acts, instead of a general char-
acter, does not necessarily destroy its capacity to create appre-
hension. Nor does its distance in time from the moment of the
affray necessarily have that effect. * * * * * * Certainly
all analogies of the law (apart from the common sense of the
situation) favor such evidence; for if particular vicious acts of
an animal are relevant to show that its owner was warned of its
viciousness (*post,* § 251), and if particular misconduct of an
employee is relevant to show that his employer was warned of his
incompetency (*post,* § 250), then particular deeds of unscrupu-
lous violence may well be deemed relevant to show an apprehen-
sion of violence from such a person. The true solution is to ex-
ercise a discretion, and to admit such facts when common sense
tells us that they could legitimately affect a defendant's appre-
hensions. The state of the law in more recent times has come
on the whole to favor the admissibility of such facts."

Wc agree with this writer that reason, if not the weight of judicial decision, favors the admissibility in evidence of such facts, when the question is the knowledge or belief of the defendant in the dangerous character of deceased, and the necessity for acting in self defense. And on parity of reasoning where self defense is relied on and there is some evidence that deceased was the aggressor, and the question is what the deceased probably did do, his *quo animo,* as evidenced by his recent acts of turbulence even towards a third person, so connected in time, place and circumstance with the homicide, as to likely characterize the deceased's conduct towards the defendant ought, on the principles stated by this writer in said section 63, to be received in evidence, for the question then is what deceased probably did, not what defendant probably thought deceased was going to do.

The application of this distinction, so often overlooked, and so clearly stated by Mr. Wigmore, we think well recognized by other writers, and in some leading cases, now to be referred to. In 6 Ency. of Ev. 783, the rule we approve is stated thus: "The violent conduct of the deceased shortly preceding the homicide, though in the absence of and unknown to the accused, is admissible to show his condition of mind and characterize his conduct during the fatal difficulty and by some courts is regarded as part of the *res gestae.*" We do not think the rule of *res gestae* should be so limited in its scope as counsel for the State would limit it. We find the rule applicable in homicide cases thus comprehensively stated in 21 Cyc. 924: "The *res gestae* in cases of homicide are the surrounding facts of the transaction, explanatory of the act, showing motive for acting, or standing in a causal relation to the crime. The *res gestae* consist of circumstances or declarations made admissible in evidence by reason of their connection with the particular fact under investigation, and the test is, whether the fact or circumstance put in evidence is so connected with the main fact under consideration as to illustrate its character, to further its object, or to form in conjunction with it one continuous transaction. They are proper to be submitted to the jury provided they can be established by competent means, sanctioned by the law, and afford any fair presumption or inference as to the question in dispute."

In *People* v. *Lilly,* 38 Mich. 270, the deceased's behaviour on

the way to the scene of the homicide was held admissible to cor-
roborate the evidence as to his violent conduct during the con-
flict. In *State* v. *Beird*, 118 Iowa 474, evidence that the deceased
on the night of the homicide, while intoxicated, and going from
one saloon to another shortly preceding the homicide, made an
assault upon a third person, was held improperly excluded, on
the ground that it indicated "a state of mind continuing up to
the time of the affray, and which would be likely, in ordinary
human experience, to lead to aggression and combativeness at
that time." In the Virginia case of *Muscoe* v. *Commonwealth,*
87 Va. 460, 464, the trial court admitted a witness to testify
that "just before sundown" upon the evening of the day of the
homicide, as he was parting with him the person said: "Buster,
I feel hot; I feel like I could shoot a man and make him jump
so high before he touches the ground" (indicating the height by
his hand), and "Don't tell me to take care of myself. Tell the
people that I pass by to take care of themselves." The appel-
late court responding to the point of error made against the ad-
missibility of this evidence, said: "We are of opinion that this
testimony was properly admitted. Coming, as it did, almost
immediately before the killing, it shed light upon the condition
of the prisoner. It may not be admissible strictly as evidence of
intention or of threats, but it certainly shows that the prisoner
was in a reckless frame of mind and ready to use the weapon
with which he was armed upon none or the most trifling provoca-
tion." Citing Whart. Cr. Ev., § 756; *Hopkins* v. *Com.*, 50 Pa.
St. 9, and *State* v. *Burke,* 71 Ala. 377. In *State* v. *McIver,* (N.
C.) 34 S. E. 439, the court said: "The prisoner also proposed to
ask the witness if the deceased did not exhibit this violent and
vicious temper towards another of his hands that morning, and
beat him unmercifully. This was also excluded. In this we think
there was error." In our own case of *State* v. *Abbott,* 8 W. Va.
741, it is said: "It is a great mistake to suppose that the *res
gestae,* in the legal sense, is, in a case of murder, confined to the
fact of thrusting the knife into the body, and thereby depriving
of life. The *res gestae* is the murder, and the murder is made
up of the homicide and the intent with which it was committed.
Actions, therefore, which seem to demonstrate the *quo animo* are
a part of the *res gestae,* and words which are a part of

these actions are admissible." A very pertinent case is *Sneed* v. *Territory,* 16 Okla. 641, in which the court holds, that where, on the trial of an indictment for murder, the defendant claimed to have shot the deceased in self-defense and when the latter was intoxicated, and it appeared from the evidence that there was no eye witness to the affray other than the defendant, that the parties were on friendly terms up to the very day of the difficulty, and that, without provocation, one committed an uncalled for and violent attack upon the other, that it was error to exclude testimony that on the evening of the homicide the deceased had a difficulty with another person, which grew out of an invitation on the part of the deceased to drink with him, and that when his invitation was refused, deceased attempted to shoot such person.

Many other cases cited in support of this rule, state and federal, fully support our view. In our case of *State* v. *Sheppard,* 49 W. Va. 594, it is said: "All acts and conduct of the deceased previous to the fatal encounter may be shown in evidence, which form a part of the *res gestae,* or which in any manner tend to shed light upon the question of motive or malice, or of legal provocation, or upon the question whether the defendant committed the homicide." And in *Maher* v. *People,* 81 Am. Dec. 781, 789, it is said: "No other cause being shown for the assault, the proposed evidence, if given, could have left no reasonable doubt that it was, in fact, committed in consequence of the alleged provocation, whether sufficient or not; and all the facts constituting the provocation, or which led to the assault, being thus closely connected, and following each other in quick succession, and the assault itself in which they resulted, constituted together but one entire transaction. The circumstances which, in fact, led to the assault, were a part of the *res gestae,* which the jury were entitled to have before them to show what was the real nature of the act, the *quo animo,* state of mind, and intention with which it was done." In *State* v. *Bright,* (S. C.) 71 S. E. 821, the first point of the syllabus is: "Acts of decedent done immediately before the homicide to show his mental attitude are admissible on the issue of self-defense." And in *McAnear* v. *State* (Tex.), 67 S. W. 117-119, that Court says: "We know of no rule of law authorizing the exclusion of any evidence that

makes manifest the guilt of a defendant, or that tends in the remotest degree to exculpate him."

It seems quite unnatural and contrary to human experience that a public officer, circumstanced as Waldron was, and so far as the evidence discloses, with no apparent motive other than self defense, or in the heat of passion due to some sudden affray, should have shot down two men. If the former and justifiable, no crime was committed; if the latter, the crime was manslaughter, not murder in the second degree.

On the record now presented we think the evidence of Hermanson and Baxter, excluded, should have been admitted, and that the court below erred in rejecting it, entitling the prisoner to a new trial.

The point is made, that as the prisoner admitted the killing, and as the law presumes all murder to be murder in the second degree, putting the burden of showing justifiable homicide on defendant, if the excluded evidence had been admitted, in connection with all the other evidence, the presumption of guilt would not have been overcome thereby. In answer we may say that there is always a presumption of malice from the use of a deadly weapon; but this rule is applicable only when nothing is offered in explanation, such as self defense and the like. 2 Chamberlayne Mod. Law of Ev., section 1155, citing among other cases, in note, our case of *State* v. *Clark,* 51 W. Va. 457. And "the fact that the alleged self-defense was effected by the use of a greatly superior weapon is by no means conclusive of malice." *People* v. *Barry,* 31 Cal. 357, cited in same note. In *Perkins* v. *State,* (Ga.) 52 S E. 17, it is held that if the accused offers evidence explanatory of the homicide admitted, no presumption of malice arises. The latter proposition, however, according to our cases, would not preclude an instruction on the presumption of murder, the homicide being proven.

Finally, as to the instructions. Exceptions were taken to the giving of all of the State's instructions, and to the rejection of certain of the defendant's instructions. We have considered all these exceptions; but find little merit in any of them. Most of them propound legal principles, applicable to the evidence, many times ruled upon, and we will not undertake to discuss any of them except State's instructions numbered one and three, given, and defendant's instruction numbered five, rejected.

The first criticism of State's instructions numbered one and three, is that the proposition common to both, that homicide proved, or admitted, is presumed to be murder in the second degree, is inapplicable where self defense is relied on, or where the facts and circumstances shown in evidence tend to justify the killing, or reduce the offense to one of lower degree. There is no merit in this criticism. The point is fully covered by prior decisions, which need only be referred to. *State* v. *Gravely,* 66 W. Va. 375; *State* v. *Taylor,* 57 W. Va. 228; *State* v. *Clifford,* 59 W. Va. 1.

An additional criticism of State's instruction number three is, that it tells the jury that the law of self defense is the law of necessity, not limiting it, as in State's instruction number twelve, given, to apparent necessity. But this instruction does not stop with this general declaration of principle. It precedes a statement of the law of self defense, which tells the jury that unless the prisoner acted on the honest belief that it was then and there necessary to take the life of deceased in order to save his own life, or free himself from some great bodily harm, he was not justified therein, and that if the jury believed that defendant, though previously assaulted, used more force than was reasonably necessary to repel the assault, or shot or continued to shoot after the necessity for so doing had ceased, they could not acquit him. We see nothing in this statement of the law prejudicial to defendant. The instruction as a whole practically limits the law of necessity to apparent necessity, and read in connection with State's instruction number twelve the jury could not possibly have been mislead by it.

Lastly as to defendant's instruction number five, rejected. This instruction reads: "The Court instructs the jury that where there is more than one assailant, the slayer has the right to act upon the hostile demonstration of either one or all of them, and to kill either one or both of them, if it reasonably appears to him that they are present for the purpose and acting together to take his life or do him some serious bodily injury."

This instruction was approved in *Carson* v. *State* (Tex.), 136 Am. St. Rep. 981, and the proposition approved in Wharton on Hom. 396, and cases cited by him, and we think states a correct legal proposition. But we do not think the prisoner was pre-

judiced by its rejection, because the same proposition was cover-
ed substantially and in terms more particularly appropriate to
the concrete case, in defendant's instruction number one, given.

For the error in rejecting the evidence of Hermanson and
Baxter we are of opinion to reverse the judgment below and
grant the prisoner a new trial, as already ordered.

*Reversed and New Trial Granted.*

WILLIAMS, JUDGE, (*dissenting*) :

In order that one may have a clearer understanding of the
error, found by the majority of the Court, it is necessary to state
more fully than it is stated in the opinion, not only the undis-
puted facts connected with and surrounding the homicide, but
also to state more fully the rejected evidence. One can then see
more clearly the relative importance which the opinion gives to
the excluded testimony, and will be better prepared to judge of
its value as a precedent.

Defendant's presence at Madge Murray's is thus explained by
the evidence. It was reported to him that whiskey was being
unlawfully sold at her house; and he procured his brother to go
there and see if he could buy some whiskey; his brother took
with him one Bob Trivetts, went to the house, and bought a half
pint of whiskey from one of the inmates by the name of Flor-
ence Blackburn; and, about dark on the day of the homicide,
informed defendant of the fact. Without procuring a warrant
for her arrest, defendant and W. M. White, chief of police of
Keystone, went there to arrest Florence Blackburn, and were
told by a number of the inmates that there was no girl of that
name there. Defendant says he went to the house without a war-
rant, at the suggestion of the chief of police who said he would
hold them until defendant could get United States warrants.
Defendant's brother was not with him, and he was not able to
identify the girl. Some of the witnesses testify that he remarked,
that if he could not find Florence Blackburn, he would arrest
all that were in the house. After writing a note to the mayor,
with the view of sending defendant with it to procure warrants,
White decided to go himself, giving as his reason that he knew
better where to find the mayor than defendant did; and left de-
fendant on guard. Before he returned the tragedy was enacted,

and defendant had departed. Defendant testifies that, after·
White left and while he was standing in the dance hall, two men
came out of Madge Murray's room to where he was standing in
the dance hall, and the big fellow says: "Come over in the room
where you can sit down, its no use standing up," and that he
followed him into the room. There was a light in the room.
He further says: "I was behind him. I heard the door shut,.
and just turned my head that way (indicating) and the small-
est one had his back to the door and this big fellow struck me."·
The larger of the two men was Tate and the smaller one Gilles-
pie. In this lighted room behind closed door the homicide oc-
curred, and defendant is the only living eye-witness to it.

Without usurping the function of the jury, to pass upon the·
weight of conflicting oral testimony, the Court is not warranted
by the record to say, as it has done in its opinion, that defendant
was "enticed" into the room by the two men; and that the door·
was shut "by one of them." That defendant was *enticed* to
enter the room, by the simple invitation which I have quoted
from his own testimony, is certainly not to be inferred from the·
language used; whether or not deceased intended to entice de-
fendant into a secret place for an evil purpose, was a question
which only the jury could determine, and their verdict would·
seem to indicate that they did not so interpret the invitation.
And the other question, who shut the door after the three men
had gone into the room, is a disputed fact. Rose Coleman says·
defendant shut it himself, and in doing so mashed her finger.

Defendant says he shot in self-defense; that when the door·
closed he turned his head, and Tate, who had entered the room
in front of him, struck him and knocked him to his knees and
dazed him; that both of the men jumped on him and commenced
beating him; that he caught hold of the bed and pulled himself·
up, pushed away from them, pulled out his pistol and began
shooting, and shot five times. But, after hearing defendant's
answers to questions on cross-examination, the jury evidently did·
not believe his story. From the statements in the opinion, to
which I have alluded, and the mention therein made of the fail-
ure of the state to prove any motive for the killing, and the im-
portance which the opinion gives to such failure, it is apparent
that the majority of the Court have been strongly influenced by

the weight which it has given to the testimony of the accused who is contradicted by other witnesses who testified for the state, and by the undisputed facts in the case.

I do not think the reasons assigned for reversing this case are sound; and I am convinced, by a careful inspection of the rec-. ord, that the question of defendant's guilt or innocence was one of fact for the jury, and that it was not error to exclude the testimony of Baxter and Hermanson. The homicide with a deadly weapon having been proven, and admitted, a case of murder in the second degree was established. Motive, other than malice, which may be inferred from the use of the deadly weapon, is no element of the crime; and the state was not required to show a motive, other than legal malice. But defendant pleaded self-defense as the motive; and it was incumbent on him to prove it to the satisfaction of the jury, not to the satisfaction of the court. Cross-examination of a witness is the best test known to the law for ascertaining the truth of his testimony. The cross-examination of accused covers about twenty pages of the printed record; and a perusal of it will convince any impartial reader that the jury were justified in not believing his account of the homicide. I here give a few extracts from it which are fair samples of its character throughout, viz: "Q. You say that Tate struck you and knocked you down? A. Yes sir; he knocked me to my knees. Q. Where did he strike you? A. Right on my forehead here (indicating). Q. What did he strike you with? A. I don't know." * * * * "Q. Where was Tate standing while you were shooting? A. He was beating me all of the time, I guess. Q. On which side of you? A. I don't remember. Q. Where was Gillespie standing while you were shooting? A. They were both beating me all of the time from the time he struck the first lick. Q. Were they beating you while you were shooting? A. Yes sir. Q. When you raised up didn't you shove yourself back from the bed? A. Yes sir. Q. When you shoved yourself back from the bed, didn't you shove yourself away from them? A. I don't remember. Q. When you shoved yourself back from the bed then you don't remember whether you were away from them or not? A. No sir. Q. It was when you shoved yourself back from the bed that you commenced shooting? A. I suppose so. Q. When you commenced shoot-

ing you don't know whether you were away from them or not?, from the first lick he struck me, and I don't remember. Q. In A. No sir. Q. What were you shooting at? A. I was dazed which direction were you shooting? A. I don't remember." * * * * "You tell the jury you haven't any idea where you were shooting; is that correct? A. Yes sir. Q. Did you see these men while you were shooting? A. I don't remember. Q. You tell the jury that you don't remember whether you saw them or not, is that right? A. Yes sir."

The undisputed facts are that neither Tate nor Gillespie was armed with any kind of weapon, and both were in their shirt sleeves; that defendant was armed with two No. 38 Smith & Wesson revolvers; that he did not know either Tate or Gillespie, and had not heard of the Hermanson difficulty; that he fired five shots, every one of which struck the body of one or the other of his victims, Tate's body having two bullet wounds, one of which entered the back, and Gillespie's body having three, one of which entered the back of his neck, that several minutes after the shooting defendant came out of the room, closed the door and left the building before it was known by any of the inmates that a homicide had been committed; that the furniture in the room was found to be in orderly arrangement, indicating that no scuffle had taken place; that defendant had a small abrasion on his forehead, "just a little scratch just about an inch long," says Dr. S. A. Daniel who examined it shortly afterwards, and thought it could not have been caused either by a man's fist, or by a certain poker that was found in the room and exhibited to him.

For the purpose of proving that deceased was the aggressor, defendant offered to prove by F. J. Baxter and Sam Hermanson, that deceased had a difficulty with said Hermanson in the house a short time before defendant and White came. The Court refused to admit the evidence; and for that cause the judgment is reversed. The rejected testimony is, in substance, as follows: Baxter was asked if Ben Tate was drinking, and he said he thought he was, and gave as his reason that he saw him in a fight; he said he did not think that "three or four sober men would get on one man". But he admitted that he did not see Tate staggering, and did not smell whiskey on his breath; that

he did not see the beginning of the fight, and did not know how it started. When asked, by counsel for defendant, if Tate was in a violent frame of mind, he replied: "I couldn't say what frame of mind he was in;" that all he saw to indicate his frame of mind was that he was fighting with Sam Hermanson. The excluded testimony of Hermanson is, that he knew Tate, but did not see him there; that the difficulty started between himself and Madge Murray; that it was on account of an old grudge between them; that "she had it in for (him) several weeks before;" that she ordered him out, and he sat down and refused to go, and she caught hold of his arm to lead him out and he jerked away; that then "Wade Gillispie hit (him) and threw (him) down on the floor, and this man (Baxter) helped (him) to get out of there."

I respectfully submit that this testimony has no causal relation to the homicide; that it reflects no light upon it whatever, and is, therefore, no part of the *res gestae.* Again, I insist that it does not prove, or even tend to prove, either that Tate was a man of quarrelsome and bellicose temper, or that he was in a violent state of mind at the time of the homicide. The testimony does not prove that Tate attempted to do any violence to Hermanson, or that he was even in fault. According to Baxter's testimony there were three or four men on Hermanson; but who the other two were, besides the two that were killed, or whether they were dressed in buckram suits or not, or whether all were trying to do violence to Hermanson, or whether some of them, including Tate, were simply trying to prevent Hermanson from doing violence to some one else, does not appear. And, according to Hermanson's testimony, Tate was not one of the many men that he says were on him; and it is very reasonable to suppose that he, knowing Tate personally and being the person most seriously affected by the fray, would know it, if he had been one of them. But, even if the testimony showed that Tate was in a violent frame of mind at the time of the Hermanson difficulty, which I insist it does not show, still there was ample time for his anger to cool before defendant came to the house. Neither does it follow that, because a man is angered toward one man, he will attempt vengeance upon a stranger.

I do not question the right of a person who is on trial for murder, and who claims that he acted in self defense, to prove the character of deceased for violence. He may do so for either of two purposes, viz: (1) To show that he was prompted to shoot by a reasonable apprehension of death or great bodily harm to himself. But defendant did not know Tate, hence his character, whatever it might have been, could not have aroused his apprehensions. (2) When it is material to know who was the aggressor in an affray, and the evidence is so conflicting as to leave the matter in doubt; and when character evidence is offered for this purpose it is immaterial whether the accused had previous knowledge of it or not. But, on the vital question, of who was the aggressor in this case, there is no conflict of testimony. Defendant is the only living witness to it, and he only has spoken concerning it. Therefore, granting for argument's sake, that the evidence is of a character tending to prove that deceased was a violent man, still nothing would be gained by proving it, because no other witness has denied that defendant killed in self defense. The only denial of it is found in the uncontroverted facts which I have above recited; and these facts could not be changed, or affected, by the most direct proof that deceased was of a violent character, which, at most, only tends to prove a probability, not a fact. The law recognizes that a bad man may sometimes be in the right, and that a good man may sometimes be in the wrong; and no one is justified in taking the life of another simply because he has a bad character. Never having known Tate, or heard anything in regard to his character, defendant could not have apprehended danger from him on account of his character. No witness has denied and, therefore, there is no occasion to corroborate his story by such evidence as tends only to establish a probability in any case, and such as, in this case, could not possibly overcome the undisputed facts. If defendant had not testified, the same verdict which the jury did find would have been inevitable, under the law; but having testified that he did the killing in self defense, the verdict depended upon whether or not the jury believed him, and not upon whether they believed some other witness' testimony in preference to him, for there was no one who contradicted him on the vital fact of his defense. Therefore, even if

1 be wrong in my view that the testimony of Baxter and Hermanson is not admissible, still I can clearly see that its exclusion did not prejudice defendant; because, if admitted, it could have produced no effect upon the undisputed and unalterable facts and circumstances on which the verdict rests.

Moreover, I deny that the rules of evidence admit proof of a single isolated difficulty between deceased and a third person, when unknown to the accused, as evidence of violent character. See, on this subject, the following authorities: Underhill Crim. Evi., sec. 325; *State* v. *Roderick,* 77 O. St. 301; 82 N. E. 1082, and numerous cases cited in the note to this case reported in 14 L. R. A. (N. S.) 708. See particularly the following cases: *State* v. *Elkins,* 63 Mo. 159; *State* v. *Ronk,* 91 Minn, 419, 98 N. W. 334; *State* v. *Mims,* 36 Ore. 315, 61 Pac. 888; *State* v. *Andrews,* 73 S. C. 257, 53 S. E. 423; *People* v. *Gaimari,* 176 N. Y. 84; *Hardgraves* v. *State,* 88 Ark. 261; *Harrison* v. *Commonwealth,* 79 Va. 374; *Sturgeon* v. *Commonwealth,* (Ky.) 102 S. W. 812; *Warrick* v. *State,* 125 Ga. 133

In *Beard* v. *Insurance Co.,* 65 W. Va. 283, we held that, where it was sought to establish the fact that, at the time of insured's death, he was intoxicated, evidence was inadmissible to prove a single intoxication at another time, because a single act does not tend to prove character, or habit. The application of the rule in the two cases is the same. If the habit of drunkenness can not be proven by a single act of intoxication, no more can a single difficulty prove general character for violence.

The best proof of character is general reputation; and defendant made no attempt to prove the character of deceased in that way, and presents no excuse for not doing so. I am convinced by the record that defendant had a fair and impartial trial. Whether or not he is guilty of the crime of which he was convicted is not for me to say; but I can, with perfect propriety, say that there is ample evidence, disclosed in the record, to support the verdict; and human experience and observation teach us that juries always resolve their doubts in favor of the accused, and that, when they do err at all, they usually err on the side of mercy. They were the judges of the value of defendant's testimony; they saw him face to face, observed his countenance and heard his words; and they evidently refused to

believe him; this they had a right to do; it was their minds that had to be satisfied, for the law constitutes them the triers of the facts. The location of the wounds on the bodies of the dead men; the orderly arrangement of the furniture in the room; the fact that five shots were fired, every one striking the bodies of one or the other of the victims; the improbability that a man, after being struck and knocked down and dazed, and set upon by two men, one larger than himself, as defendant said he was, could free himself, and afterwards kill both his assailants, and come out of the affray with only a slight abrasion on the forehead, was an account of the killing, which seems to have taxed too heavily the credulity of the jury.

The opinion lays stress upon the fact that no motive is shown for the killing. I have answered this, but still I admit that it seems unnatural that one man should slay another for no cause whatever. But the jury only can judge the motive. They have said that it was not self preservation; it follows that they believed it was malicious. It is useless for me to speculate upon what the jury might have thought, for it was their consciences that had to be satisfied. However, I will mention one or two causes that the evidence might have suggested to their minds. It will be remembered that defendant was left to guard the house while White went for the warrants; and there is also testimony that defendant said that, if he did not find Florence Blackburn, he would arrest all that were in the house. The jury may have thought that defendant himself closed the door to the room, and undertook to guard the men in there, and that they attempted to escape, and were shot; or, they may have believed that a quarrel arose, and defendant shot because he was angered, perhaps on account of what he conceived to be an improper interference with him in the exercise of his official duty.

I think the testimony of Baxter and Hermanson was properly excluded. Rules of evidence are founded on reason and human experience, and are intended to aid courts and juries in arriving at the truth and justice of a case. Such rules are generally established by the courts; few of them have their origin in legislative enactment. I admit that some courts have, in recent years, gone to very great length, in murder trials, in admitting proof of difficulties between the deceased and third persons, as

evidence of deceased's character for violence, when the accused relies on self defense; but an examination of the cases cited in the majority opinion, and a comparison of the evidence held by the courts in those cases to be admissible, with the evidence in this case which this Court holds should have been admitted, and for excluding which the majority have reversed the trial court, will show that this Court has gone much further than any of them. If the opinion is to become the law of this State, it does seem to me that it will serve no needful purpose in the administration of justice, but instead will furnish new causes for appeals and prolongations of murder trials; and deferred trials too often result in unjust acquittals. In recent years the courts of this country have been severely criticized by the public, on account of the many delays and uncertainties in the administration of justice. This criticism is not wholly without just cause; and, in recognition of it, all the great political parties have, this year, pledged themselves, by their national platform declarations, to correct the evil by legislation, as far as possible. The growth of the law in England and in this country shows that many delays, appeals and reversals have been due to rules of evidence, and rules relating to pleading and practice, which the courts themselves had established, but which parliament, and the legislatures of the various states, later either modified, or abolished altogether.

It is a fundamental rule of evidence that a fact should be proven by the best evidence, when possible to do so; and the best proof of character is proof of reputation. Why then should not one on trial for murder, who wishes to prove the violent character of deceased, be required to do so by proving his general reputation for violence, when he can do so? That is the best method of proving character, and so recognized by all the courts. Why should not the rule be adhered to? Why have some of the courts departed from it in trials for homicide? Defendant did not offer to prove the character of Tate by general reputation.

I quote the following from the report of the Committee on Judicial Administration and Legal Reforms, adopted by the West Virginia Bar Association, at its annual meeting held at Grafton this year, on the question, whether or not the death pen-

alty should be inflicted for any cause at the hands of the state, for the purpose of showing that the courts are considered, by the bar, to be largely responsible for the laxity that exists in the administration of criminal justice, viz.: "The percentage of murders throughout this nation exceeds that of any civilized land. The figures are not at hand, but it is notorious, that not only is the proportion of such crimes higher than abroad, but the proportion of convictions are fewer. The trouble with us, is not that the penalty is so severe, but that the guilty so often escape. The contrast between our country and England is very strong both as to the rareness of crimes of blood and the certainty of the death penalty in murder of first degree."

And, to show the impression made upon the legally trained mind of a highly cultured and closely observant Englishman, after sojourning for sometime in the United States, and witnessing the way in which justice is administered in the courts of the various states, and comparing it with the administration of justice by the courts of his own country. I quote the following from James Bryce's "American Commonwealth"; in his chapter on "State Judiciary", page 204, viz: "All crimes, except such as are punishable under some Federal statute, are justifiable by the state court; and it is worth remembering that in most States there exists much wider facilities for setting aside the verdict of a jury finding a prisoner guilty, by raising all sorts of points of law, than are permitted by the law and practice of England. Such facilities have been and are abused, to the great detriment of the community."